THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RICHARD BASKE, Defendant-Appellant.

First District (4th Division)   No. 77-1265

Opinion filed November 9, 1978.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Mary Ann Callum, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Cook County convicting the defendant, Richard M. Baske, of murder and burglary. After a jury trial and the judgment of conviction the court sentenced the defendant to a period of not less than 100 nor more than 300 years in the Illinois State Penitentiary.

The issues presented for review are (1) whether the trial court erred in denying defendant's motion to suppress statements; (2) whether the court erred in finding police officers properly searched pursuant to consent given by defendant's parents; and (3) whether the defendant was proven guilty beyond a reasonable doubt.

The defendant was arrested and charged by indictment with the offense of murder in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and with the offense of burglary in violation of section 19—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 19—1). After a jury trial the defendant was found guilty of both offenses. From the judgment of conviction

the defendant has taken this appeal. Prior to the jury trial, the defendant filed motions to quash his arrest, suppress evidence illegally seized and suppress statements. The hearings on these motions were conducted simultaneously and denied.

At the hearing on the motions, Investigator Daniel Fitzgerald testified he was assigned to investigate the homicide of Lorretta Hoppe. At 7:15 a.m. he proceeded to Holy Cross Hospital and examined the body of Lorretta Hoppe. The body was partially burned and contained multiple stab wounds.

Investigator Fitzgerald proceeded with the investigation by having a conversation with Officer Paluch. Officer Paluch told him where the fire and homicide had occurred, and gave Investigator Fitzgerald a wallet he had recovered from the scene. This wallet was found in front of the victim's house on the top of the front bushes. The wallet contained papers and identification belonging to Robert Stevenson.

Investigator Fitzgerald proceeded to the home of Robert Stevenson with other officers. They questioned Robert Stevenson about his wallet. He told them the wallet was his and on February 15th his car was broken into and his tape deck and wallet were missing. Mr. Stevenson said he thought Gary Gambera or Richard Baske could possibly be guilty of the theft.

Investigator Fitzgerald continued to the home of the defendant, Richard Baske, at 2229 West 72nd Street, and spoke with the defendant's parents. They did not know if their son Richard was home. The Baskes then went downstairs and returned with the defendant. Investigator Fitzgerald questioned the defendant. The defendant told him he had been out drinking and he returned home between 2 and 3 in the morning. Baske stated he did recall hearing the fire engines and fire sirens but that was all he knew about it.

Investigator Fitzgerald and the defendant went downstairs to the basement and the defendant pointed out a brown army field jacket as being his. Investigator Fitzgerald smelled the jacket and stated it smelled of smoke. The defendant then told Fitzgerald he got dressed when he heard the fire engine and he went to the corner to watch the fire with the neighbors. The defendant also stated at one point he opened the door so a stretcher could be removed. The defendant was then placed under arrest.

The defendant was transported to Area Police Headquarters and Sergeant Owen advised the defendant he had become a suspect in the death of Mrs. Hoppe and also advised the defendant of his rights which he read from a card. The defendant indicated he understood his rights.

Investigator Fitzgerald questioned the defendant in the interview room of Police Headquarters. The defendant stated he was not involved and he would take a lie detector test. Investigators Barrett and Bamberger transported the defendant to 11th and State Police Central Headquarters

to take a polygraph test. Later, Investigator Fitzgerald received a phone call from these investigators and Fitzgerald was told that the defendant Baske had confessed his part in the crime.

After the polygraph test, the defendant was brought back to 39th and California and again questioned by Investigator Fitzgerald. The defendant was asked what he had said downtown and he gave a statement, which he signed.

The defendant named Michael Leonard in his statement as an accomplice, and Investigator Fitzgerald spoke with Michael Leonard, who denied participation in the offense. He stated he was at work all night. Leonard also gave the police the names of two persons that he worked with. These two people were contacted and they stated Leonard had been with them all evening. Investigator Fitzgerald then told the defendant Leonard seemed to have an airtight alibi. The defendant then stated it was not Michael Leonard but Gary Gambera.

The next witness for the People was Assistant State's Attorney James Klein. His testimony substantiated Investigator Fitzgerald's testimony.

Joseph Barrett, a homicide investigator, also testified for the People. Barrett was assigned to investigate the homicide of Mrs. Lorretta Hoppe. Investigator Barrett and his Investigator Bamberger transported the defendant to the crime lab at 11th and State.

After the polygraph test had been given, Barrett told the defendant he had failed the test.

On March 25, 1974, at 5 p.m., Investigators Barrett and Bamberger went to the defendant's home and asked Mrs. Baske if they could look through the personal effects of the defendant. Mrs. Baske stated they could look in the area where her son lived, in the basement of their home. Barrett and Bamberger then went down into the basement. They searched the basement and Bamberger found a hunting knife in a sheath.

Dorothy Baske, the mother of the defendant, testified this knife was usually kept in the tool room. Her husband used the knife to strip coating off a wire. Mrs. Baske did not know if Richard used the knife to strip coating off a wire or if Richard used the knife.

The defendant, Richard Baske, also testified at the suppression hearing. On direct examination Baske stated that from 3 p.m. to 6 p.m. on March 22, 1974, he was drinking with a friend.

At 7 p.m. the defendant was at the Fairfield Lounge and remained there until closing at 2 a.m., while drinking continually during that time, before going home.

On cross-examination the defendant stated he was still able to walk out of the tavern at 2 a.m. He stated he remembered walking home.

At 7 p.m. on March 22, 1974, the defendant was at the Fairfield Lounge where he had 15 drinks by 10 p.m.

Although the defendant stated he never left the house from 3 a.m. until 9 a.m. on the 23rd of March, he also stated he did leave his house and went to a restaurant on 71st and Western. He thought it was around 7 a.m. and he was heading back to the Fairfield Lounge to get his wallet. He stopped and had breakfast at 5 J's Restaurant. He stayed in the restaurant about 10 minutes and walked home past Mrs. Hoppe's house. He was not sure if the fire engines were there then or later on, after he had been at home and went back out. The defendant talked to his neighbors at the scene of the fire, and opened the door for the ambulance drivers.

Emmett Smith, a court reporter, also testified for the People. Smith recorded the statement of the defendant Baske at Area Headquarters. Smith did not notice anything unusual about the defendant. There were no conversations with the defendant off the record. The defendant was responsive to the questions and there was nothing unusual about the way he responded to the questions.

The defendant then called as a witness Werner Tuteur, a psychiatrist. Tuteur had examined the defendant at the Cook County Jail for more than one hour. The defendant had been a heavy drinker and a user of drugs since the age of 16. The psychiatrist was given a hypothetical question and gave an opinion that at the time the defendant gave a statement he was still under the influence of alcohol and drugs and this statement was not voluntary. His opinion was based on the fact the large amount of alcohol and drugs had not been eliminated by the body at that time and the defendant was suffering from a severe hangover. The doctor's opinion was based on facts the defendant related to him, not upon independent observations.

At trial the People called as witness Officer Paluch. Officer Paluch testified that on March 23, 1974, at 6:50 a.m. he and his partner, Norman Stubitsch, received a call of a fire at 2251 West 72nd Street. They proceeded to that address and saw fire pouring out of the building. Officer Paluch saw several firemen bring out what appeared to be a body wrapped in a white sheet.

Officer Paluch then went into the premises at 2251 West 72nd Street and noticed there were several fires started. He saw the place was ransacked and there were distinct areas of burning in the house.

Paluch was then approached by a fireman and was given a wallet. There were snowy conditions in late evening and early morning of March 23, 1974. The ground was wet but the wallet was dry when Officer Paluch received it from the fireman.

Paluch also stated he noticed various identification cards with the name of Robert Stevenson inside the wallet and also an inscription about the North American Bank.

Paluch then went to Holy Cross Hospital where he observed the body of Lorretta Hoppe and also noticed there were multiple stab

wounds on the body. At the hospital Paluch turned the wallet over to Investigator Fitzgerald.

Michael Leonard also testified for the People. He testified he has known the defendant for 10 years.

In the middle of February, between 2 and 3 a.m., Leonard met the defendant at the Fairfield Lounge. The defendant stated Stevenson had a new tape player and they should go and get it. Leonard and the defendant went to the 7100 block on Claremont, where Stevenson lived. The defendant got out of the car and entered Stevenson's car. The defendant returned in five minutes with Stevenson's tape player and a black leather wallet. The defendant said something like "this could come in handy." The defendant kept the wallet and Leonard believed he also kept the tape player, but was not certain of this.

Leonard also stated in early March of 1974, he left the Fairfield Lounge with the defendant at 2 a.m. They proceeded to the 7200 block on Oakley to burglarize a home. The defendant told Leonard the residence contained $5,000 and an older woman resided there, but was not home.

Leonard stood by the east gangway and the defendant told him to wait by the front windows. Leonard gave the defendant a pocket knife and he cut the phone wire on the east side of the house, in the gangway. The defendant then opened the front window and Leonard climbed inside, into the basement. The defendant then turned the electricity switch off and Leonard heard the furnace shut off. Leonard heard walking upstairs and told the defendant the woman was home. The defendant said it didn't matter and they could gag her and put her in the closet. Leonard refused and he climbed back out the front window.

After five minutes the defendant came out and stated he took care of everything and they could return when she was not at home.

On March 22, 1974, Leonard stated he called the defendant from work at 9:50 p.m. at the Fairfield Lounge and asked him about some tires. Leonard worked at the A & P Store at 1501 East Hyde Park from 10 p.m. to 7 a.m., where he restocked the shelves. The entrance and exits were all locked and Michael Hasen, a fellow employee, had the keys, which were only to be used for emergencies. Leonard stated he had known Hasen for the five months Leonard had been working at the A & P, and he did not know Hasen personally outside the store.

Leonard also stated he was arrested on March 23, 1974, and transported to Homicide Headquarters, and he was released later that same day.

People's Exhibit #2, the wallet, found at the crime scene was admitted into evidence over the objection of the defense counsel. A series of stipulations were then made. It was stipulated the victim's blood type was A positive, the knife recovered from the defendant's home had type A blood on it, and the defendant had type A blood.

Investigator Barrett then testified for the People. His testimony was substantially the same as his testimony at the hearing on the defendant's motions.

The next witness was Investigator Bamberger. He stated on March 25, 1974, he and Barrett went to 2229 West 72nd Street. With the Baskes' permission, he searched their basement and on the west wall he found a knife with a five-inch blade, in a brown case. A piece of the handle was broken off, and he noticed red stains on the blade.

Investigator Fitzgerald also testified for the People at trial. His testimony was substantially the same as his previous testimony at the hearing on the defendant's pretrial motions.

The next witness for the People was Assistant State's Attorney Klein. He was called by Investigator Fitzgerald and he went to 39th and California, where he saw the defendant. Klein read the defendant his rights and the defendant stated he wished to make a statement. Klein called a court reporter, who arrived at 4:30 p.m. Klein questioned the defendant for 15 minutes. A statement was then typed and the defendant read and signed it.

The substance of the statement is as follows:

On March 22, 1974, Baske received a telephone call from a friend named Michael Leonard. Leonard said he had a deal to make some money and Baske agreed to participate as a look-out man. They took separate cars and met at 2251 West 72nd Street. Leonard went through the front window of the basement. Baske then went to the back of the house. About 15 to 20 minutes later, Leonard came out of the basement door and said, "Let's go." Leonard had a boy scout hunting knife in his hand and he cut the telephone wires as they went through the gangway. Leonard said the old lady woke up and he cut the telephone wires in case she tried to call the police. Leonard got into the car and told Baske to get his car, and meet him at 71st and Bell, which he did. Leonard said he got $10 and he gave Baske $5, then said he was going to work. Baske went in his house and about one-half hour later, heard the fire engines. When he heard the fire engines, he opened his basement window and saw they were at the corner. He went down to the fire and asked the neighbors what happened. He held the door open for the ambulance attendant as the stretcher was brought out. When the fire was over, he went home. The defendant also stated he was not harassed or beaten and was given anything he asked for.

Assistant State's Attorney Klein then saw Michael Leonard and told the defendant Michael Leonard had an alibi, that had been confirmed. The defendant then replied it was not Leonard but Gary Gambera who was involved in the burglary.

At 11:30 p.m. Klein had another conversation with the defendant. He

was told Gambera's alibi was also confirmed. The defendant then stated he never said it was Gambera, and he indicated he did not want to make any further statements.

The first defense witness was Josephine Jenkins. She testified that on March 23, 1974, she owned Five J's Grill, located at 7114 South Western Avenue. At 5:40 a.m., the defendant came in for breakfast, and he left the restaurant at 6:15 a.m.

Cissie Dugan also testified for the defense. She stated on March 22, 1974, she was a barmaid at the Fairfield Lounge. The defendant came into the lounge at 7 p.m. on March 22. She served him 13 or 14 drinks through the course of the evening.

The next witness was Dorothy Baske, the defendant's mother. She testified on March 22, 1974, two police officers came to her home, announced their office and asked if the defendant was home. The defendant came up from the basement of her home and the fire down the block was discussed. The defendant was told he had to accompany the police officers, and he was taken away.

On March 25, 1974, two more police officers came to Baske's home. They announced their office, showed a piece of paper and asked Mrs. Baske to sign it. She asked her husband what it was, and he told her to sign it. She stated she did not understand what the paper was, nor did she have her glasses on. Mrs. Baske signed the paper, and the police officers went down to the basement.

The police officers searched the basement for 15 to 20 minutes. They found a knife behind the conduit, on the west wall of the basement. She did not know who placed it there. The knife belonged to her husband who used it to strip wire, although her husband had cut himself with the knife.

The defense then rested its case.

After hearing arguments of counsel and being instructed as to the law by the judge, the jury returned verdicts finding Baske guilty of murder and burglary. After a hearing in aggravation and mitigation, the court sentenced the defendant to a period of 100 to 300 years in the Illinois State Penitentiary.

The defendant contends certain statements allegedly made by him to police officers following his arrest (1) were not voluntarily made, and (2) were the direct result of the defendant's illegal arrest.

With regard to the voluntariness of the statement, the defendant argues even though he was advised of his rights and responded that he understood, he was never asked to repeat or paraphrase what he had been advised. In addition, the defendant testified he had been drinking to excess and had been taking Valium for several hours prior to his arrest.

The People maintain the defendant's own testimony shows he was functioning normally. When the defendant left the bar, where he had

been drinking, he walked without falling or requiring any assistance. The defendant's own testimony shows he remembered in detail the evening of March 22, 1974. He remembered the drinks he had, the phone call he received, and the other bars he went to. The defendant admitted he was able to walk home, and the exact route he took.

With regard to a voluntary waiver of his *Miranda* rights, the defendant was advised of his rights by five different people. Each time, the defendant replied he understood his rights or he was previously informed of them. The defendant also signed a waiver form.

■▌ With regard to a denial of a motion to suppress, a trial judge's finding will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.

■▌ The trial court's finding of voluntariness was not contrary to the manifest weight of the evidence.

With regard to the legality of the defendant's arrest, the defendant contends he was arrested without probable cause, and his statement was therefore inadmissible.

■▌ The defendant was connected to the murder by a wallet, which was found at the murder scene, by his residence a few doors from the murder scene and by his initial denial of his presence at the murder scene, which was later contradicted by his admission he had been at the fire. These circumstances were sufficient to establish reasonable grounds for the arresting officers to believe the defendant had committed the instant crime, and therefore the statements made by the defendant were properly found to be admissible.

■▌ The defendant next contends the trial court erred in finding the police officers properly searched his living quarters, pursuant to consent given by his parents.

The defendant argues the consent given by his parents was not voluntary and the police officers exceeded the scope of the consent to search.

Shortly after the police officers arrived, Officer Barrett asked Mr. and Mrs. Baske if the officers could search their home. Both Mr. and Mrs. Baske said it would be perfectly all right. A consent form was handed to Mrs. Baske. She read this form and signed it. Mrs. Baske admitted the officers asked her if they could go down in the basement and she said they could. She also stated the officers did not threaten her and they were very nice and polite.

We find the record fully supports the trial court's determination. The consent to search given by the defendant's parents was valid and the scope of this consent was not exceeded.

The defendant also submits he was not proven guilty beyond a reasonable doubt.

Lorretta Hoppe was murdered and her home was burglarized in the early morning of March 23, 1974. Evidence offered at trial against the defendant included his written inculpatory statement. The defendant admitted he went to 2251 West 72nd Street, the victim's home, and served as a lookout while Michael Leonard went inside the house. Leonard came out after 15 to 20 minutes with a hunting knife in his hand which he used to cut the phone wire.

Michael Leonard, testifying for the People, stated the defendant had burglarized the victim's home a few weeks before the murder. In early March 1974 the defendant went to the 7200 block on Oakley, with Leonard. The defendant cut the phone wires, went into the basement with Leonard and turned off the electricity switch. Leonard then left the house because he heard the owner upstairs. The defendant came out after five minutes and stated he took care of everything, and they would come back when she was not at home.

The defendant was also linked to the crimes by physical evidence. Robert Stevenson's wallet was found in the front bushes of the victim's home in the early morning of March 23, 1974, by a fireman. This wallet, containing Robert Stevenson's identification, was dry, although it had been snowing and the ground was wet. Stevenson's wallet had been stolen in early February by the defendant, from Stevenson's car. The defendant kept Stevenson's wallet, stating that it might come in handy.

The defendant was also connected to the crime by the hunting knife found in the basement of his parent's home, where the defendant resided. This knife was found hidden, stuck behind a conduit on the wall, near where the defendant slept. There were red stains on the knife. The stains were analyzed and found to be type A blood, the same type blood as the victim, whose cause of death was multiple stab wounds. The size of the blade recovered at the defendant's home was consistent with the size of the wounds in the body of the victim.

The defendant was also seen one block away from the crime scene about eight minutes before the fire alarm call was first responded to. At 6:35 a.m., on March 23, 1974, Officer Roy Allen saw the defendant walking across a gas station on the northeast corner of 72nd and Western, which was one block from the victim's home at 2251 West 72nd Street. Officer Allen heard a fire alarm a short time after seeing the defendant. At 6:41 a.m. Harold Callahan responded to a fire at 2215 West 72nd Street.

The defendant also continued to alter his story throughout the day, when confronted first with the confirmed alibi of Michael Leonard and then of Gary Gambera. Leonard's alibi was established at trial by Mike Hasen and Afram Asmar.

■■ The defendant's inculpatory statement, as well as the circumstantial evidence and the evidence of prior burglary of the victim's home, proved

beyond a reasonable doubt the defendant committed the crimes of burglary and murder.

■■ Asserting each as separate grounds for reversal, the defendant also questions (1) whether all material witnesses were produced by the People as to the voluntariness of the defendant's statements, (2) whether the trial court properly excluded the testimony of defense witness Carol Alarando, (3) whether the People's comment in closing argument as to the defendant's post arrest silence was proper, (4) whether the failure of the People to adduce competent evidence to perfect impeachment is proper, (5) whether a proper foundation was laid for the introduction into evidence of the wallet found at the scene of the crime, (6) whether error occurred when hearsay evidence was admitted to bolster evidence of alibi for other suspects to the crime, and (7) whether the People's closing argument was prejudicial. The validity of these claims of error will not be considered. None of these seven points was properly preserved for review by proper objection and inclusion in the defendant's motion for a new trial. The failure to present proper and timely objection generally constitutes a waiver of error, if any (*People v. Adams* (1968), 41 Ill. 2d 98, 242 N.E.2d 167; *People v. Lewis* (1977), 51 Ill. App. 3d 109, 366 N.E.2d 466). The failure by the defendant to raise an issue in his written motion for a new trial constitutes waiver of that issue and it cannot be urged as a ground for reversal on review (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856).

The defendant claims the People's comment on the defendant's post arrest silence and the hearsay evidence admitted to bolster the evidence of alibi for other suspects to the crime were both plain error under Supreme Court Rule 615(a) (Ill. Rev. Stat. 1975, ch. 110A, par. 615(a)).

A review of the record indicates the verdict which was returned was the only reasonable one which could have been reached on the basis of the evidence presented. While complaint of serious prejudice may be considered on appeal, even though no objection was made at trial, in order to be so recognized the alleged prejudice must have played a significant factor in the jury's determination (*People v. Moore* (1973), 55 Ill. 2d 570, 304 N.E.2d 622). A complete review of the record reveals the alleged plain errors were not of such serious character to be a material factor in the defendant's conviction, nor were they of such prejudice to require reversal.

For the foregoing reasons, the judgment of the circuit court of Cook County is hereby affirmed.

Affirmed.

LINN and ROMITI, JJ., concur.