(No. 42928.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TERRY R. EDWARDS, Appellant.

*Opinion filed September 25, 1973.*

RONALD BUTLER and ROBERT G. FOSTER, both of Chicago (WINSTON & STRAWN, of counsel), for appellant.

28

WILLIAM J. SCOTT, Attorney General, of Springfield, and BERNARD CAREY, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and KENNETH L. GILLIS and DOUGLAS CANNON, Assistant State's Attorneys, and TERRENCE McGUIGG (senior law student), of counsel), for the People.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Terry Edwards, was found guilty by a jury in the circuit court of Cook County of the offenses of murder and robbery and sentenced to concurrent terms of not less than 100 nor more than 150 years on the murder conviction and not less than 19 nor more than 20 years on the robbery conviction. The record shows that Sidney J. Salkin, the victim, age 68, died on September 8, 1968, as the result of having been severely beaten on September 3, 1968.

Elvis Eddmonds, age 14, testified that on September 3, 1968, he resided at 3525 West Douglas Street in Chicago. On that morning, at approximately 10:30 A.M., he and six other boys were sitting on a basement-level window ledge at 3525 W. Douglas when he heard someone in the hallway of the building call out "Help!" He saw two men run from the hallway through the east gangway of the building and described one of them as wearing a yellow knit sweater and dark pants, and as having a small goatee or beard and a hairstyle known as a "process." He identified defendant as that man although at the time of trial defendant was wearing his hair in a "natural" style. He testified that prior to trial he had identified defendant in a lineup of seven persons.

He testified that after the two men had run out of the gangway he looked into the hallway and saw Sidney Salkin, whom he had known "since I was born." Salkin came to the building at 10:00 A.M. every Saturday

morning. He stated that "there was blood all over" Salkin's face, that Salkin "staggered" to his car, drove away and returned with the police. The witness picked up what he described as Salkin's "bills" and cigars, and gave them to his father.

James Wilson, age 16, testified that he was sitting on the window ledge with Eddmonds and that his two brothers, Willie and Larry, and Michael Marks, were also there. John Griffin was coming across the street from the park, where they had all been playing ball earlier. Wilson heard someone yelling for help, and saw two boys running out of a hallway and through the gangway between 3521 and 3523 Douglas. He looked in and saw Salkin lying on the floor of the hallway. He was bleeding about the face. Salkin then staggered to his car, drove away and returned with the police. The witness identified defendant in court as one of the two boys whom he had seen running away and testified he had also identified him at a lineup of seven persons. He stated that when he saw defendant running from the building he had a light moustache and a "little bit of hair on his chin," "process" hair, and was wearing a yellow knit sweater and dark pants. He testified that defendant had a white handkerchief wrapped around the knuckles of one hand and the other boy had brass knuckles.

John Griffin, age 13, testified that at approximately 10:00 A.M. on the morning of September 3 he was in a park across the street from 3525 West Douglas when he heard a man call for help. He went to the hallway, where he saw Salkin being beaten. He stated that he saw the beating both from there and from the window ledge where the other boys were sitting. He saw Salkin being hit about the face and stomach and being kicked. He identified defendant as one of the assailants and described him as having a slight moustache, a little beard under his chin and a "process." He remembered defendant was wearing a

yellow knit sweater. He also testified that he saw defendant pick up a wallet from the floor just before the two assailants ran away.

Michael Marks, age 15, testified that he was with Eddmonds, James Wilson and James' brother and saw two persons beating Salkin. He identified defendant as one of the assailants and described defendant's clothing and his "process" hair. He had also identified defendant at the police lineup.

Willie Wilson, age 13, and Larry Wilson, age 10, testified that they had seen Salkin being beaten but could not identify defendant as an assailant. Neither had viewed the police lineup. Both testified that one of the assailants wore a yellow knit sweater and had a "process" and that the other had brass knuckles.

John McGown, who had lived in the neighborhood for about 35 years and had done janitorial work at 3525 West Douglas testified that about 10:30 A.M. on September 3, 1968, he was in the alley behind the building when he saw defendant, whom he had known for several years, and another man, exit from the gangway between 3521 and 3525 West Douglas into the alley. They ran past McGown, and he heard the other man comment to defendant about hitting someone. This individual had something across his knuckles, but the witness could not say what it was. He had seen Salkin that day but did not see anyone strike or beat him.

James Sample and Robert Campbell, called by defendant, testified that they were with defendant in Arkansas during the last few days of August of 1968 and until September 2, when defendant returned to Chicago.

Defendant, age 22, testified that he arrived home from Arkansas about 7:00 A.M. on September 3, 1968. He remained at home talking with his mother until about 11:30 A.M. and then went to bed. He denied any participation in the beating or robbery of Salkin, denied seeing anyone do this, and denied having been in the

vicinity of 3525 West Douglas on September 3, 1968. Jean Edwards, defendant's mother, testified that he returned home at 7:30 or 8:00 A.M. on September 3, talked to her until 11:00 or 11:30 A.M. and then went to bed.

Defendant, as grounds for reversal, contends that the circuit court committed reversible error when it denied his motion to suppress the identification testimony of the People's witnesses. He argues that the identifications were based upon a lineup which was conducted in a prejudicially suggestive manner. The circuit court conducted a hearing on the motion to suppress and it appears from the testimony that the lineup was not conducted in a manner which was violative of defendant's right to due process or which would lead to a mistaken identification. There were seven individuals in the lineup, all of whom were approximately the same age as defendant, two of whom were the same height, and the participants changed their positions in the lineup a number of times. The testimony shows that the witnesses were kept separate and there is no showing that any of them had an opportunity to suggest the identity of the defendant to the others. Defendant's principal complaint with respect to the lineup is that he was the only man in the lineup with process hair but it appears from the testimony of one of the police officers that at least one other participant in the lineup wore what he described as a "short process." We note, parenthetically, that in the hearing on the motion to suppress, the witnesses referred to a photograph of the lineup which was marked as an exhibit, but for reasons not explained the photograph is not included in the record. From our review of the testimony we conclude that the manner in which the lineup was conducted was not so conducive to improper or erroneous identification as to violate defendant's right to due process. Furthermore, although he had changed his hair style, the witnesses identified the defendant in court and the testimony supports the conclusion that there was a basis independent of the lineup for the

in-court identifications. The trial court did not err in denying the motion to suppress.

Defendant contends next that the evidence does not prove beyond a reasonable doubt that he committed the murder, and although, admittedly, the victim was beaten, there is no evidence that he was robbed. He argues that the conviction rests upon the testimony of alleged occurrence witnesses who were very young and that there are so many inconsistencies, contradictions and improbabilities in their testimony that the convictions cannot stand. In our opinion there is sufficient evidence to support the conviction for the offense of robbery. There was testimony that defendant was seen picking up a wallet after the beating, and Darby Salzman, the deceased's brother-in-law, testified, without objection, that the deceased was robbed and beaten on September 3. Although hearsay and excludable on proper objection, Salzman's testimony was of probative value, and together with the testimony concerning defendant's picking up a wallet, and the presence of the decedent's "bills" on the floor following the occurrence, is sufficient to support the conviction for robbery. Although there are minor discrepancies in the testimony of the teenage witnesses, it is clearly shown that they had an opportunity to see the defendant, their identification testimony was persuasive, and we hold that the evidence is sufficient to support the jury's verdict finding defendant guilty of murder.

Defendant contends next that the trial court erred in permitting three of the boys who were under 14 years of age to testify without preliminary inquiry as to their competency. At the trial there was no objection to their testimony on this ground and no request made that the circuit court inquire as to their competency. Although in the absence of objection the alleged error is not preserved for review, because of the obvious importance of the witnesses' testimony, we elect to review the defendant's contentions. (*People v. Bridgeforth, 51 Ill.2d 52.*) The

record shows that on cross-examination defense counsel conducted a brief inquiry into the competency of each youthful witness who identified defendant. We have previously held that the degree of a child's intelligence, and not his age, determines his competency (*People v. Davis, 10 Ill.2d 430*), and the record shows that these witnesses, whose demeanor and ability to testify had been observed by the trial court, were competent.

Defendant contends further that the trial court erred when it refused his request for a brief continuance during the course of the trial in order to enable him to produce a witness who was then in Indiana. The record reveals that shortly before the selection of the jury, defense counsel advised the court that five days earlier he had learned the whereabouts of Freddie Stokes, in whose car defendant had traveled to Arkansas and with whom he had returned to Chicago on the morning of September 3. At the time of trial Stokes was living in South Bend, Indiana, and defendant requested a continuance so his counsel could go there with a summons and arrange to transport him to Chicago. Defense counsel assured the court Stokes would appear voluntarily but that he needed the summons in order to receive the proper witness fees and travel expenses. The court denied the request for a continuance and advised defense counsel that he could go and get the witness following the selection of the jury. No action was taken by defendant to secure the witness's appearance until three days later when, at the close of defendant's case, he moved for a continuance until the next day to allow time to communicate with Stokes and arrange for him to come to Chicago for the purpose of testifying. Defense counsel advised the court that Stokes would testify that he was with defendant in Arkansas, that they had left Arkansas on September 2, 1968, that he and defendant arrived in Chicago at about 7:30 A.M. on September 3, and that he believed that defendant had gone home at that time. This testimony, as outlined by defense

counsel, was substantially the same as that of Sample and Campbell with respect to when defendant had left Arkansas and similar to that of defendant and his mother insofar as it fixed the time of defendant's arrival in Chicago. It did not, however, purport to account for defendant's whereabouts at the time that the crimes were committed. Confronted with such an offer of proof, and in view of counsel's lack of diligence in taking action sooner to procure Stokes' attendance, the trial court did not abuse its discretion in refusing to allow a continuance in order to secure testimony which would have been merely cumulative and "could scarcely be thought to affect the result here ***." *People v. DeMary, 37 Ill.2d 364, 370.*

Defendant next complains that he was prejudiced by the failure of the prosecution to supply him with the joint statement of John Griffin and Michael Marks, which the police had reduced to writing. After Griffin had testified, and part way through the cross-examination of Marks, a copy of the joint statement was tendered to defendant. At no time during the testimony of Griffin did defendant seek to see any statement made by that witness. Defendant had made an oral pretrial motion for "any statements that were reduced to writing," which the People now contend referred only to statements made by the defendant. Narrowly construed the request could be so interpreted, but, although inartfully phrased, we conclude that the People, in response thereto, should have produced the statement. (*People v. Flowers, 51 Ill.2d 25.*) The statement, for reasons not explained, is not in the record and it cannot therefore be determined what the witnesses may have told the police. It is described as a two-page document and its use in cross-examination of Marks does not appear to have served to impeach him on any material matter. We note further that no effort was made to recall Griffin for further cross-examination because of any matter contained in the statement, and under the circumstances we cannot say that failure to make the statement

available at an earlier time was so prejudicial to defendant as to require reversal. We note, parenthetically, that had this case been tried subsequent to the adoption of Rule 412(a)(i) (50 Ill.2d R. 412(a)) this problem would not have arisen.

Defendant contends that inflammatory remarks made by the prosecution in closing argument were so prejudicial as to require reversal. We find no objection made by defendant at trial to any portions of the argument of which he now complains and the error, if any, is waived. (*People v. Winters, 29 Ill.2d 74.*) We have examined the closing arguments and do not find the remarks of which defendant complains to be so inflammatory and improper as to require, in the absence of objections, any further consideration by this court.

Defendant contends next that he was prejudiced by certain statements relating to reasonable doubt which were made by the assistant State's Attorney during *voir dire* of the jurors, and again during closing arguments. These comments were made in an effort to explain to the jury that a reasonable doubt is determined by the standard of "reasonableness" and was not the same as "beyond any doubt" or "beyond any possible doubt." In *People v. Malmenato, 14 Ill.2d 52,* at page 61, the court said, "Reasonable doubt is a term which needs no elaboration and we have so frequently discussed the futility of attempting to define it that we might expect the practice to be discontinued", and the Committee Note in I.P.I. Criminal (2.05), citing *Malmenato,* recommends that no instruction defining reasonable doubt be given. From our examination of the record we conclude that although it would have been better practice not to attempt to define the term "reasonable doubt" either in *voir dire* or closing argument, no error resulted which requires reversal.

Defendant contends that he was denied his right to a speedy trial because more than 13 months elapsed between his incarceration and trial. The record shows that in large

part the delay was attributable to motions for continuance or other motions made by defendant and that there was no violation of defendant's rights under section 103—5 of the Code of Criminal Procedure (Ill. Rev. Stat. 1967, ch. 38, par. 103—5), or of his constitutional right to a speedy trial. (*People v. Hairston, 46 Ill. 2d 348.*) Nor does the record reflect, as contended by defendant, that he suffered prejudice as the result of nine days having elapsed between the date the indictment was returned and the date of his arraignment.

Defendant contends that the circuit court committed reversible error in refusing to permit cross-examination of the witness, John McGown, with respect to an alleged prior statement which tended to exculpate defendant from the crime. McGown's testimony on direct examination, reviewed earlier in this opinion, was that on September 3, 1968, he had seen defendant, whom he had known for several years, and another man, running from the gangway between 3521 and 3525 West Douglas. On cross-examination it was shown that prior to trial, in the presence of defendant's mother, McGown had talked to defense counsel. There was no offer of proof made, but in colloquy between court and counsel, outside the presence of the jury, defense counsel stated that the witness had told him in that conversation that although he had seen the defendant near the scene of the crime at about the time the deceased was beaten, he knew defendant had not committed the offense. The court refused to permit the question to be asked in the presence of the jury on the ground that the answer would be hearsay. Defendant contends that the statement was not hearsay for the reason that it was the statement of the witness then testifying, that it was not offered to prove the truth of the assertion but to demonstrate that McGown had made the statement, and that the question and answer would have a bearing on the jury's consideration of his credibility. He argues further that the court, outside the presence of the jury,

should have inquired into the source of McGown's knowledge that defendant had not committed the offense, in order to determine what further information defendant might properly be permitted to elicit.

The People argue that McGown's statement was a "conclusory opinion" and hearsay. We do not agree. What transpired here is precisely the situation hypothesized and discussed by Professor Wigmore (3A Wigmore, Evidence, sec. 1041, at 1052 (Chadbourn rev. ed. 1970)):

> "The usual case of this kind is that of a *general statement upon the merits of the controversy,* which is now offered against a witness who has testified to a specific matter. Thus, A testifies for the prosecution that he saw the defendant near the scene of the alleged arson; it is offered to show that he has elsewhere declared that he is sure that the defendant is innocent; is this admissible?
>
> The usual answer of some courts is that the declaration should be excluded because it is mere opinion (sec. 1918 *infra*). This is unsound, (1) because the declaration is not offered as testimony (sec. 1018 *supra*), and therefore the opinion rule has no application, and (2) because the declaration in its opinion aspect is not concerned, and is of importance only so far as it contains by implication some contradictory assertion of fact. In short, the only proper inquiry can be, Is there within the broad statement of opinion on the general question *some implied assertion of fact* inconsistent with the other assertion made on the stand? If there is, it ought to be received, whether or not it is clothed in or associated with an expression of opinion. As a matter of precedent, the rulings vary more or less in the results reached; most of them are vain quibbles." See also annotations at 66 A.L.R. 289 (1930), and

158 A.L.R. 820 (1945); McCormick on Evidence (2d ed. 1972), sec. 35.

In our opinion the court erred in refusing to permit the defendant to inquire of the witness whether he had made the prior statement, implicit in which was the refutation of the inference of guilt which arose from the defendant's presence at the place where McGown saw him. In that sense the statement, although embodying a conclusion, was contradictory of the testimony, and was admissible for the purpose of laying a foundation for impeachment. We need not speculate as to the extent of permissible inquiry had the question elicited an admission that the witness had indeed made the statement, nor in that case, what explanation of the statement, if any, might have been elicited upon further inquiry by the People.

Although the court's ruling was error, we cannot say that it was so prejudicial as to require reversal. Had McGown been permitted to answer the question, an admission that he had made the statement, or, in the event of denial, the testimony of defendant's mother offered as impeachment would have been admissible solely as impeachment, and not as proof of whether or not defendant had committed the crime, and we cannot say that the erroneous limiting of the cross-examination was so prejudicial as to require reversal. It is noted that the jury obviously did not believe defendant's mother's alibi testimony, and we are not persuaded that her testimony in impeachment of McGown's denial would have been more favorably received.

With respect to the contention of the defendant that the circuit court erred in failing to inquire as to the basis for McGown's alleged statement and the source of his knowledge, it is clear from the record that defense counsel had interviewed the witness, there was no contention that he had refused to talk to him and no reason to assume that interrogation by the court would result in obtaining information not already available to defense counsel. Had

the witness, in fact, been in possession of knowledge which would aid the defendant, defense counsel could have called him as his witness and no effort was made so to do. The record shows, too, that defendant made no request for time to again interview McGown, and we conclude that this record does not reflect circumstances which would impose upon the circuit court the duty to follow the procedure suggested by defendant.

Defendant has enumerated other alleged errors and deficiencies which, he argues, "when considered with the totality of the other alleged errors" require reversal and remandment for a new trial. We have considered them and conclude that neither singly nor collectively do they require reversal of the judgment of conviction. The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*