(No. 45630.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JAMES MOORE, Appellee.

*Opinion filed November 30, 1973.*

WILLIAM J. SCOTT, Attorney General, of Spring-field, and BERNARD CAREY, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and KENNETH L. GILLIS and JAMES E. STARUCK, Assistant State's Attorneys, of counsel), for the People.

JAMES J. DOHERTY, Public Defender, of Chicago (SHELVIN SINGER and JUSTINE KNIPPER, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

James Moore, defendant herein, and Silas Hart were indicted for the murder of Walter May, whose death was caused by multiple stab wounds to the brain. Following a separate jury trial in the circuit court of Cook County defendant, who was represented by retained counsel, was convicted and sentenced to the penitentiary for a term of 30 to 60 years. The appellate court reversed and remanded for a new trial holding that the closing argument of the assistant State's Attorney contained matters which constituted reversible error. (*People v. Moore, 9 Ill. App. 3d 231.*) We granted the State's petition for leave to appeal. The determinative issue is whether a portion of the State's closing argument denied defendant a fair trial.

Prior to trial an extensive hearing was conducted on defendant's motion to suppress various oral statements which he had purportedly made to several law-enforcement officials. The trial court denied the motion and no issue concerning their admissibility was raised in the appellate court.

At trial Lawrence May testified that the victim, his brother, owned a yellow 1968 Pontiac with a black top. He described his brother as being of slight build.

William Evans, a police officer in Robbins, Illinois, testified that at 3:30 A.M. on April 7, 1969, he arrived at 138th Street between Utica and Sacramento Avenues

where he discovered the victim's body in a dark, desolate area. No identification or wallet was found.

Arthur Jackson of the Cook County sheriff's police was assigned to the case and arrived at the scene at 1:00 P.M. on April 7. He made certain measurements, photographed pertinent portions of the area and noted blood stains near a tire rut and on the roadway. The following evening he was with officer Graca, assistant State's Attorney Richard Jalovec, and defendant, who was in custody. During the conversation with Jalovec, the defendant described the events concerning the killing. Defendant stated that on April 6 at about 10:00 P.M. he and Hart purchased liquor at a store. Upon leaving this place they met the victim, who drove them about the area in his car as they conversed and drank. Another stop was made to obtain more liquor and they continued to drive. Defendant said he was sitting in the front passenger seat and Hart was in the rear of the vehicle. The victim stopped near the area where his body was later discovered. Hart grabbed the victim around the neck, took his wallet, demanded his jacket and forced him out of the car. As the three men stood outside the vehicle, Hart seized the victim's jacket and the victim lunged at the defendant, whereupon defendant stabbed him several times in the head with the screwdriver which he had previously taken from the glove compartment. He described the weapon as being about 8 inches long with a yellow handle which was partially covered with black rubber. Defendant believed that Hart took the weapon from him after the incident. Both men drove to Chicago and on their return journey Hart, who was driving at an excessive speed, lost control of the vehicle which came to rest on an expressway embankment. They left the disabled car and hitchhiked to Robbins.

On cross-examination Jackson denied that defendant told him he knew nothing of the killing. In response to a question concerning the reason why no written statement was made of defendant's conversation, Jackson explained

that defendant refused to discuss the matter after a court reporter was summoned.

Donald Shaw of the sheriff's police testified that on April 8 he was instructed to go with other officers to the Robbins police station. There Shaw saw defendant, who was seated in a sheriff's car. Shaw and officer Gorgano drove to a sheriff's station in Homewood. The former advised defendant of his constitutional rights and he responded that he had been previously informed and that he understood. Upon their arrival these officers and defendant went to a detective's office where they were joined by officer Graca. Defendant substantially reiterated the events described to officer Jackson and stated that after he had stabbed the victim on the roadway, the latter ran a short distance before collapsing in a weedy area. He said that after he and Hart had initially driven from the scene of the crime, they returned and noted that the victim was still alive. Following this conversation the defendant was taken to the State's Attorney's office.

Shaw testified that the next morning he drove defendant to another jail prior to his appearance in court. While in the car defendant described the screwdriver, which matched the description given in the State's Attorney's office the previous evening. Defendant offered to show the place where he threw the weapon. They went to the murder scene and, at defendant's instruction, Shaw and another officer entered an area covered with foliage located in the vicinity where the body had been discovered. The search produced a screwdriver matching this description. Laboratory tests indicated that its tip was covered with blood, although the minute amount prevented additional analysis. On cross-examination Shaw admitted that his police reports did not mention defendant's confession.

Silas Hart was called as a witness and explained that he had agreed to testify and in return the State would accept a guilty plea to voluntary manslaughter and

recommend five years probation. Hart, who had been released on $2,500 bond, testified that he met defendant in front of a tavern prior to the murder and both began to drink from defendant's bottle of liquor. After consuming its contents, they entered the tavern and talked to defendant's girl friend and several others. Later he and defendant, whom he described as being "high", went to a nearby liquor store and purchased wine. Upon leaving they met the victim and events basically took place as previously described until they drove to the vicinity of the murder. Here, Hart stated that defendant asked the victim if he might drive the car but his request was refused. Defendant manipulated the transmission lever, stalling the car, and then reached into the glove compartment taking a sharp object from it and placing it under his sweater. Hart said that defendant told the victim where to drive and then pull off the road. The victim refused defendant's order to leave the car and told defendant that he would have to kill him. Defendant said that he would and attacked the victim striking him several times with the screwdriver. Hart described the victim's face as being bloody. After the attack defendant grabbed the victim's wallet, which was later discarded, and dragged him from the car. Upon leaving the vehicle, Hart observed the victim, who was still alive, lying on the ground and defendant standing nearby. They left the victim, drove away and returned later to find him still alive. At this time Hart observed another car in the area. The remainder of his testimony described the ride to Chicago culminating in the expressway accident. His version, however, differed, for he said that defendant was driving the vehicle.

Assistant State's Attorney Richard Jalovec testified as to the conversation he had in his office with the defendant in the early evening hours on April 8. This witness's testimony substantially corroborated the version of the incident which defendant related to officer Shaw.

Defendant testified in his own behalf denying any

complicity in the crime, although he admitted riding in the victim's car that evening while he, Hart, and the victim drank and talked. Defendant said that he had consumed a great amount of alcohol commencing at 7:30 P.M. at the tavern and ending about 11:15 P.M. when Hart and the victim had to assist him into his mother's house where he went to bed. He denied seeing the victim or Hart again or making any inculpatory statements to law-enforcement officials. He further denied directing police to the location of the screwdriver and insisted that Shaw did not have the weapon when he emerged from the field. He asserted that he gave Jalovec the same version of the events described in his testimony. On cross-examination he said that when he arrived home his mother was not present because she was working; that there was a light on in the front of the house; and that the door was closed but unlocked. He was unable to say if his father, sister, two nieces or two nephews were at home but he thought they were, although he did not know if anyone saw him enter the house. He also testified that he did not know any of the police officers or Jalovec prior to his arrest.

After various character witnesses had testified for defendant, the State called Thomas Olawumi, who had known defendant for ten years. Between 1:30 and 2:00 A.M. on April 7 this witness was driving near the scene of the murder on 138th Street after he had completed towing a vehicle to the police station. He observed a black and yellow Pontiac on the side of the road with its parking lights on. As he slowly drove toward the front of the vehicle, one man entered the car on the passenger side, apparently activating the interior light, which permitted this witness to see defendant sitting behind the steering wheel. He reported the incident to police later that day when he became aware of the killing.

During the lengthy closing argument to the jury the following statement was made by the assistant State's Attorney.

"*** Mr. Moore said, among other things, and most essentially that he went home at about somewhere around 11:30 the night of April 6, 1969, after being high and went to bed. Who did he live there with? Sister, mother, father, nieces and nephews. Did you hear, ladies and gentlemen, any corroboration for his alibi? Anybody willing besides himself to say yes—his own sister, perhaps —to say Yes, he did come in. 'I saw him.' Totally unsupported, his story. By even members of his own family. Even his own family didn't come in here and under oath say that he was with them."

The appellate court construed this remark as prejudicial error for it was directed at defendant's purported failure to call witnesses in his behalf when there was no attempt by defendant to establish that these individuals were in fact witnesses. We cannot agree. No objection was made to the State's argument. Furthermore, in his closing argument defense counsel responded to the statement.

"Now, it would have been easy for me as a lawyer, and I have been in these courtrooms enough to know, that it certainly would have been better for James Moore if I had two or three people to say—his mother, sister, brother, and father to say, 'Look, he came home about eleven-thirty or twelve o'clock. He was drunk and went on in his room.' Nobody could have overcome that. Nobody. All they had to do was come and say that. But I have discovered that you don't prosecute at any price, and you don't defend at any price. And because I don't defend at any price I wouldn't have anybody come in to the courtroom and say that they saw James coming home when they didn't."

Any error in closing argument, as here, may be waived by failure to object thereto. (*People v. Edwards, 55 Ill.2d 25.*) We also believe that in the present case counsel's failure to object to the purported improper comment did not result from his inability to perceive the possible inference which it could have conveyed. He later ably rebutted the substance of the prosecution argument when he informed the jury that members of defendant's family would have testified had they in fact witnessed defendant

enter the house but since no one did he would not permit any of them to commit perjury even in an attempt to establish his client's innocence. It is clear that this response did alleviate any possible misleading inference which may have arisen as a result of the State's comment.

Moreover, we conclude that the statement was not a significant factor in the jury's determination, for to conclude that it was would require us to substantially disregard the testimony of several police officers, an assistant State's Attorney, the accomplice and the rebuttal witness. *People v. Pittman, 55 Ill.2d 39; People v. Davis, 46 Ill.2d 554, 560; People v. Nilsson, 44 Ill.2d 244, 248.*

Accordingly, the judgment of the appellate court is reversed and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*