THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALBERT ZENNER, Defendant-Appellant.

First District (2nd Division)    No. 78-867

Opinion filed October 16, 1979.

James J. Doherty, Public Defender, of Chicago (Timothy D. Murphy and Donald S. Honchell, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Linda Dale Woloshin, and Mark F. Schroeder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Defendant appeals from his conviction of one count of arson (Ill. Rev. Stat. 1975, ch. 38, par. 20—1(a)) following a jury trial, for which he

received a term of two to six years in the penitentiary. Zenner raises as issues for review whether: he was proved guilty beyond a reasonable doubt; certain of his post-arrest, pretrial statements were properly admitted into evidence and commented upon in the State's closing arguments; the State's proffered instruction on circumstantial evidence was properly given to the jury; and evidence that the owner of the burned structure did not carry insurance on it was properly admitted.

For the reasons hereinafter set forth, we affirm.

The State's case in chief opened with the testimony of Richard Whorton, a psychiatric social worker who lived on the 29th floor of a high-rise building at 55 W. Chestnut Street in Chicago. The apartment building was located on the southeast corner of Dearborn and Chestnut Streets. Whorton's apartment was located at the southwest corner of the building. On November 3, 1976, Whorton was awake watching election returns on television. At approximately 1 a.m., he walked over to the television set situated at the south wall next to a picture window and looked down toward the street. He noticed a man emerging from the back end of a building on the east side of Clark Street less than one-half block south of Chicago Avenue, into an alley illuminated by one street light at the back or east end of the building, and another at the south end of the alley, facing Superior Street. The two lights provided almost "continuous" illumination. The man attracted his attention because he was hurrying and, as he headed south down the alley, he looked back several times to the area from which he had just come. His view of the man was unobstructed.

About 10 seconds after he first noticed the man, Whorton picked up a pair of binoculars and continued watching him as he went south in the alley toward Superior; then west on Superior to Clark, still hurrying; and then crossing to the west side of Clark, again looking back toward the building from which he had come. At about this time Whorton noticed black smoke billowing from that building, and observed the man standing on the corner of Clark and Superior "watching" the building and the smoke.

Whorton then dialed 911 on his telephone located near the window to report the fire and its location. He redialed 911 to report that he had just seen a white male, between 30 and 40 years old, wearing a leather jacket, tan shirt and trousers and without a hat, leave the building that was going up in flames. Whorton was looking at the individual as he gave the description. He saw the man then head south on Clark and throw a bag into an empty lot alongside a building with the word "Victor" painted on it. The man then proceeded south to Huron Street and stood in the entryway to a restaurant located at the Wacker Hotel, and again looked back in the direction of the burning building.

The man thereafter entered a parking lot on the east side of Clark, whereupon Whorton dialed 911 a third time to report that fact. He kept him under observation until he disappeared from sight. Whorton watched the parking lot, but saw no cars pull out.

Ten to twenty minutes later Whorton again spotted the same man at the corner of Dearborn and Chicago, walking west on the south side of the street, then crossing to the north side when he was about half way between Clark and Dearborn, at which time he was stopped and taken into custody by a policeman. At about this time, when a police sergeant arrived, Whorton told him about the man's apprehension and the discarded bag. The sergeant then relayed the information to policemen below who recovered the bag.

Later, Whorton identified defendant at a police lineup and gave police his signed statement. At trial, he identified the defendant as the man he saw emerging from the building, who threw the bag away, who was arrested and whom he identified at the lineup.

On cross-examination Whorton testified that he noticed the tan bag when defendant had it with him in the alley, but was most aware of it when he saw defendant throw it away. There were very few people on the streets on the night in question, and no one else was in the alley when he observed defendant there. It was not unusual for him to see people on Clark Street with brown bags in their hands. The description of defendant given by Whorton at the police station did not state that defendant did not have a full head of hair, but did include one that he did not have long hair. Whorton asserted that this statement did not accurately reflect his description of the man in that it did not contain what was actually said about his hair. About five minutes had passed between the time Whorton first saw defendant and the time he first saw black smoke billowing from the building exited by him. He noticed the flames about the same time the fire trucks arrived, which was prior to defendant's disappearance into the parking lot. Whorton did not lose sight of him from the time he left the building until the time he disappeared into the parking lot. He described the discarded bag as "medium sized," but larger than bags generally used to carry a pint of liquor. He did not have as good an opportunity to view defendant's face as he had to view the rest of him.

Chicago police sergeant Walter Bortko testified that at approximately 1 a.m. on November 3, 1976, he received a radio call concerning a fire in the 700 block of North Clark, including a description of a suspect wanted in connection with the fire. Later given Whorton's name and address, Bortko went to see him and was informed by Whorton that defendant had just been "picked up." Bortko then advised police about the discarded bag, which they recovered from the vacant lot as described by Whorton.

The fire occurred at the Worthington Hotel at 747 N. Clark, which had been abandoned a few months before the fire. Bortko had previously responded to a number of calls regarding unauthorized persons in the hotel.

Chicago police officer James Kennedy testified that he and his partner received a radio call about a fire in the 700 block of North Clark at approximately 1 a.m. on November 3, 1976, also being apprised that a white male, 30 to 40 years old and with short, stocky build, wearing a dark leather coat, brown tannish pants and a light brown shirt was seen leaving the building. Proceeding to the site of the fire, Kennedy observed defendant wearing a dark leather coat and khaki pants walking westbound on the north side of the street and placed him under arrest.

Kennedy, after being contacted by Bortko who informed him that defendant had thrown a bag into a vacant lot at the base of a building with the word "Victor" painted on it, went to that location and recovered the bag. It was unnecessary for him to use a flashlight since lighting conditions were "very good." Inside the bag was a metal can with a "mineral spirits" smell to it. At the police station Kennedy inventoried one brown paper bag, one can of spirits of turpentine and one receipt for the purchase of the turpentine. There were about one-half dozen persons on the street at the time defendant was arrested; it was not uncommon to see people walking on the street in that area. Kennedy did not recall the description of the suspect as stating that he was bald or had a bald spot. He determined that defendant lived directly behind the Worthington Hotel. His search of defendant's person produced nothing which could have been used to ignite a fire.

Police sergeant Daniel McGrory testified that on November 3, 1976, he was serving as a watch commander for the Chicago police bomb and arson unit. Shortly after 1 a.m. he received a phone call from defendant, whose voice McGrory recognized from prior telephone and personal contact. Defendant told McGrory " 'there is a big fire in the back of my place. You better get your guys over here * * * [because] it must be an arson.' " Defendant was in a very excited state, gasping and panting over the phone. He asked McGrory to call him back at his home telephone number. When McGrory did so, defendant requested permission to watch the fire, expressing fear that he might be arrested at the scene. McGrory told defendant that he could do whatever he wanted and defendant responded that he would then tell the police he had permission from McGrory to go to the fire. McGrory again told defendant he could do as he pleased, and their conversation ended.

On cross-examination McGrory stated that he received the phone call at approximately 1 a.m., but he did not know the exact time. He heard fire engines or sirens in the background. Later that morning, McGrory had

a conversation with Whorton which was later reduced to a signed, written statement. The description of the suspect therein contained, among other things, the statement that he did not have a full head of hair.

Chicago fire department battalion chief Robert Koujourian testified that he received an alarm for a fire at 747 N. Clark at 1:01 a.m. on November 3, 1976. When he arrived at the scene the front of the building located there was totally involved in flames and heavy dense black smoke.

Lieutenant Francis Burns, a fire investigator assigned to the Chicago police bomb and arson unit, testified that he received a call from Sergeant McGrory several minutes before 1:20 a.m. on November 3, 1976, asking that he investigate a fire at Chicago and Clark. At about 1:30 a.m. he and Investigator Frank Gutrich arrived at the scene. On the first floor center of the building they discovered a 4′x6′ hole and number of smaller ones which exhibited an irregular burning pattern and indicated a liquid accelerant was used to start it. Turpentine is an accelerant which, like other oil or spirit based products, produces black smoke when burned. In Burns' opinion the fire was set with the aid of an accelerant. Burns determined that the hole in the floor had not been produced by falling firebrands or the fire department's actions. Although he requested evidence technicians to take samples for analysis, the building had collapsed and buried the point of origin prior to their arrival. Gas and electrical service had been shut down before the fire occurred.

Officer Francis Gutrich, assigned as an investigator to the arson unit of the Chicago police criminal investigation division, identified defendant as the man with whom he spoke at the Chicago Avenue police station at about 2:30 a.m. on November 3, 1976. He advised him of his constitutional rights and had defendant execute a "Miranda Waiver." Defendant then told Gutrich that "just prior" to the time the fire was reported he had been on Clark and discarded a bag containing a can in a vacant lot; that he had the can with him because he was using the turpentine for some paint spills at his residence; and that he had neither been in the alley nor in the hotel. Gutrich did not reduce defendant's statement to writing. Defendant told Gutrich that he had purchased the turpentine at a hardware store at 900 N. State and that it was used for cleaning up paint and brushes. He also asked the officer to go to his residence to see where the turpentine had been used. Gutrich and his partner went to the building but were unable to gain entry.

Assistant State's Attorney Joseph Locallo then testified as to a conversation he had with defendant after 4:45 a.m. on November 3, 1976, alone, at defendant's request. Locallo told defendant that he was an assistant state's attorney, not his attorney, and that he could not represent him. Defendant indicated that he understood, and Locallo again advised

him of his *Miranda* rights, which defendant agreed to waive. Defendant told him that he had been painting a door in his apartment building on November 2, 1976. At about 5 p.m. he decided to clean up the mess, using some turpentine he had bought in a hardware store at Oak and State Streets. At approximately 5:30, after cleaning up and while on his way to a restaurant at Clark Street and Chicago Avenue, near a building, he threw away the can of turpentine in a brown paper bag containing the sales receipt. After eating he met a friend named Joe the Hack, with whom he attended the races at Maywood Park. When he got home from the races he heard a call for a fire across the alley from his apartment over his fire band radio. Defendant refused to sign a written statement of the account he gave.

The parties stipulated that evidence technician Myers of the Chicago police department, if called, would have testified that he took fingerprints from the turpentine can, poured the remaining contents of the can into a vial, which was then attached to the can, and took fingerprints from defendant. They stipulated further that Herman Kluth, a Chicago Police Department fingerprint comparison expert, if called, would have testified that in his opinion, based on an examination and comparison of the prints taken from defendant and from the turpentine can, both sets of prints were made by the same person and that the fingerprints of defendant were on the turpentine can.

William Tyrrell, a Chicago Police Department chemist, testified that in his opinion the liquid in the vial was gum turpentine. He also tested a pair of black shoes inventoried under defendant's name for flammable hydrocarbons, but was unable to find any. The absence of flammable hydrocarbons indicated that there was no accelerant present on the shoes.

Mrs. Anita Rest, the owner of the burned building, testified over defendant's objection that on November 6, 1976, it was uninsured and wholly abandoned. She had given no one permission to set fire to it.

Joe Delino testified for the defense that on November 2, 1976, he met defendant at 5:30 p.m. at a Walgreen's Drug Store at 26th Street and Pulaski Road and at 6:15 p.m., along with Bob Guttierez, they went to Maywood Park to attend the races, leaving after the ninth race at about 11:20 p.m. Delino then drove defendant to the "El" station at 22nd Street and Cicero Avenue at approximately 12 midnight, where defendant told Delino he was going home. He was not with defendant at 1 a.m.

Anthony Ciampa testified for the defense that he was part owner of the building at 740 N. Dearborn in which the defendant resided on November 2, 1976, located directly behind the burned building at 747 N. Clark. In exchange for the use of one of the apartments, defendant assisted Ciampa in the protection and remodeling of the building. Included among defendant's duties was the painting of a door in the

building shortly before November 2, 1976. Defendant occasionally bought minor items needed to perform his duties. Garbage cans were kept only at the front of the building. He had never instructed defendant to dispose of garbage in the vacant lot on Clark Street.

Dennis Michaelson, the director of Pan-Technic, Inc., an organization which investigates the causes and origins of fires, testified that chromatographic analysis, used to determine the presence of an accelerant, would not be affected by the presence of water and might be able to determine the presence of an accelerant in a sample three years old. He performed no tests on samples from the building at 747 N. Clark.

As first noted at the beginning of this opinion, judgment on the verdict of guilty of arson was entered from which defendant here appeals.

■■ Defendant contends that he was not proved guilty beyond a reasonable doubt, assessing eyewitness identification of him as inherently unreliable and the evidence of his connection with the fire as contradictory, incredible and entirely circumstantial. As to the identification he relies upon an alleged discrepancy between Whorton's earlier description of the man he saw as not having long hair, and Sergeant McGrory's report after interviewing Whorton later that the suspect did not have a full head of hair, and also upon the alleged vagueness in Whorton's description of the precise point from which defendant left the building. Officer Kennedy's testimony, however, confirmed that the original description of the suspect supplied by Whorton and broadcast to police did not include any information about the suspect lacking a full head of hair; it was only McGrory's report based on a later interview with the witness at the police station that contained this description, which Whorton explained was inaccurate. The somewhat unique circumstance of the witness describing the suspect to police as he was looking at him cannot be overlooked and was no doubt given due consideration by the jury. Assuming for the sake of argument that the discrepancy was real and not the subject of an erroneous report, Whorton's testimony was otherwise internally consistent and credible. Eyewitness testimony in *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, including "* * * confusion concerning the amount of hair [the defendant] had on the day of the fire * * *" (74 Ill. 2d 286, 306) was recently held insufficient upon which to disregard the balance of the testimony. In any case, minor variances in eyewitness descriptions go to the weight to be given to them. (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671; *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) Further, although unable to describe on cross-examination the exact point at the back of the building from which defendant emerged, Whorton was certain that he had come from that location. From his point of vision 29 stories above the street and lacking

initially the aid of the binoculars, which he did not pick up until after defendant had left the building, Whorton's imprecision in his testimony as to his first notice of defendant does not vitiate the identification based upon the ensuing periods of sustained observation with the binoculars.

Defendant relies upon what he contends is alibi evidence presented by the State. He calls attention to Whorton's testimony that his walk from the abandoned hotel commenced at 1 a.m., a time confirmed by fire Battalion Chief Koujourian, who testified that he responded to the alarm at 1:01 a.m. Defendant then points to his own telephone call to Sergeant McGrory, described by the latter as having been received at around 1 a.m., at which time he recognized defendant's voice from previous calls and he could hear fire engines or sirens in the background. This shows, defendant maintains, that he could not have been walking around the neighborhood of the hotel and still have been at home calling the police at the same time. He further notes that the prosecutor in closing argument estimated the period of time within which he set the fire and ultimately returned to his apartment involved an approximate ten minute stretch. Defendant argues that such a timetable is inconsistent with defendant's call to police at 1 a.m. and presents a conflict in the evidence which is contrary to human experience, leaves a reasonable doubt as to his guilt, and requires reversal of his conviction.

The linchpin of defendant's theory is that Sergeant McGrory actually received the call from defendant at exactly 1 a.m. McGrory's testimony, however, is equivocal as to that time, having stated variously that it was "shortly after 1:00"; "approximately 1:00"; and "I wouldn't have the exact time of the call." The 10-minute timetable to which defendant refers was not evidence, but argument. In having stated that "after a period of time during the ten minute stretch or however long it was Mr. Zenner came up the street to his house * * * went in there * * * and called the * * * bomb and arson unit * * *," the prosecutor appears to have included the time it took defendant to set the fire inside the hotel as well as the travel time for defendant to cover the approximate four-block trek, at a hurried pace, with occasional momentary stops until he got back to his apartment. Such conjecture, however, is unnecessary in any event as the prosecutor himself observed when he qualified his argument as to the time period with the words "or however long it was." Defendant's reliance upon testimony given by Lieutenant Burns, who stated that he received a call from Sergeant McGrory "around 1:00 o'clock" reporting his conversation with defendant, is equally misplaced. Lieutenant Burns goes on to state that he received another call from the communications section "several minutes later" or "about 20 after 1:00 and we arrived at the scene about 1:30." Receiving a call from Sergeant McGrory "several minutes" before

1:20 a.m. could well have placed defendant's earlier call to him at 1:10 or 1:15 a.m., as the State contended.

■■ The direct and circumstantial evidence supporting the verdict revealed the close proximity of defendant's residence to the hotel where Whorton first saw him, and his positive identification of him; defendant's possession of a can of turpentine, an incendiary agent, at the time he left the hotel; the hotel, a few minutes later, bursting into flames; defendant having been seen later discarding the near empty can, which had his fingerprints impressed thereon; McGrory's testimony that defendant was highly excited, gasping and panting when he spoke to him over the telephone, supporting the thesis of defendant's guilty knowledge and his having run home from the parking lot and placed the call to him; defendant's statement that it "must be an arson" and his insistence that McGrory call him back at his home; and evidence that an accelerant, of a type such as turpentine, appeared to have been splashed on the hotel floor, which, when ignited, would have caused the black smoke later seen billowing from the hotel. We find no basis for concluding that this evidence was conflicting, contrary to human experience or left any reasonable doubt of defendant's guilt or any reasonable hypothesis of innocence. *People v. French* (1978), 59 Ill. App. 3d 353, 359, 375 N.E.2d 502.

*People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232, is cited by defendant in support of his contention that his connection with the hotel fire was insufficiently established, and left a reasonable doubt as to his guilt. The supreme court distinguished *Gardner* in *Berland* on grounds equally applicable to the instant case (74 Ill. 2d 286, 307):

> "[In *Gardner*] the identification of the defendant by the complaining witness was weakened by several factors, including inconsistent descriptions of the defendant and the lack of a lineup when the defendant was first identified, while the defendant's alibi was positive and unimpeached. * * * By contrast the identification here was strong, and the alibi was impeached."

In neither *People v. Abendroth* (1977), 52 Ill. App. 3d 359, 367 N.E.2d 571, nor *People v. Hougas* (1968), 91 Ill. App. 2d 246, 234 N.E.2d 63, cited by defendant, was there evidence of the defendant's concurrent presence at the scene of the crime and possession of incendiary materials, nor the *quantum* of supporting evidence present here. *People v. Miller* (1977), 55 Ill. App. 3d 421, 370 N.E.2d 1155, which defendant also cites, was reversed because evidence of "other" fires allegedly set by that defendant was prejudicially admitted.

Defendant avers that he was denied a fair trial because his pretrial statement to Investigator Gutrich and Assistant State's Attorney Locallo, although not objected to by defense counsel, were improperly admitted

into evidence and commented upon in closing argument by the prosecutor. He claims he gave them to explain why a turpentine can with his fingerprints was found in the vacant lot and to account for his whereabouts for six hours before the fire. Although defendant characterizes this evidence as entirely consistent and exculpatory and relies upon the "consistent, reasonable" hypothesis of his innocence contained therein, he now objects to its admission as hearsay. Evidence of this character, admitted, as here, without objection at trial, is to be considered and given its natural probative effect. (*People v. Akis* (1976), 63 Ill. 2d 296, 299, 347 N.E.2d 733; *People v. Koester* (1975), 31 Ill. App. 3d 28, 32, 332 N.E.2d 755.) So considered, this alibi evidence that defendant claimed after his arrest never to have been in the hotel and to have thrown away the turpentine can at 5:30 p.m. of the prior evening was contradicted by Whorton, who saw defendant emerge from the hotel building at 1 a.m. just before the fire broke out and throw away the bag containing the can shortly thereafter. Defendant, in having waived any objection to admission of his statements as hearsay, yet maintaining their wholly exonerative character, provides no basis for error in their admission *per se*. The trial court was not required to anticipate prosecutorial misuse of this evidence in closing arguments, nor to make a *sua sponte* determination of its relevance as the State's case was developing. Objection at this stage was the responsibility of defendant, who relied upon the version of events contained in defendant's statements in his case in chief, closing argument and appeal. See *People v. Precup* (1978), 73 Ill. 2d 7, 16-18, 382 N.E.2d 227.

Defendant asserts that the prosecutor's comments prejudiced the jury by suggesting inconsistencies between the statements to Gutrich and Locallo and referring improperly to defendant's exercise of his right to silence, in contravention of the rule established in *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. At issue are the following remarks made in the prosecution's initial closing arguments:

"Investigator Gutrich testified as to the statement he took from Mr. Whorton and also the statement he took from Mr. Zenner.

At that time Albert Zenner told him prior to the fire I discarded that can of turpentine, *didn't tell him anything about the restaurant, didn't tell him anything about the track*, said prior to the fire I discarded that can of turpentine.

He also told them that he used the turpentine for cleaning after he painted a door.
　　* * *

Then Joe Locallo testified, an Assistant State's Attorney.

He was on the felony review assignment that evening and Joe testified that he came to the station and he spoke with the officer,

he spoke with Whorton. He observed the line up. Then he spoke with Albert who wanted to speak to him alone. *And now Albert was ready with a story.* Albert said that he had been spray painting and putting a door in * * *." (Emphasis added.)

Defendant also alludes to the following comments made later in rebuttal:

"The investigator testified that Albert told him immediately prior that he had been on Clark Street immediately prior to the fire breaking out.

* * *

Then he starts thinking. Now, an Assistant State's Attorney Locallo comes in. They got him, they know he was there. He was in the car when they recovered the bag.* * *

* * * Assistant State's Attorney Locallo talks to him, wants to talk to him. He says I will talk to you alone. I don't want nobody here. *I don't want anybody here who heard me before and who will confront me right away and say, pal, that is just what you told me a couple of minutes ago.*

Mr. Kull: Objection, that is not the evidence.

The Court: The jury heard the evidence." (Emphasis added.)

Defendant denies the presence of any contradictions between his two statements to Gutrich and Locallo; he regards the second statement as simply more complete than the first. He maintains that Gutrich's cross-examination establishes that defendant did not tell him, as the State avers, that he had been on Clark Street "just prior" to the fire and had discarded a can in a paper bag into a vacant lot at that time. Defendant's statement to Gutrich is thus seen as consistent in all respects with the later and fuller one to Locallo, wherein he represented the time of his presence on Clark Street and disposal of the bag as approximately 5:30 p.m. the prior evening. The record is otherwise. Gutrich testified on direct examination explicitly that defendant described these events as occurring "just prior" to the fire on direct examination. While the import of his testimony as to this statement on cross-examination is not entirely clear, we are satisfied that it did not so nullify the direct testimony as to render prosecutorial reliance upon the latter in closing argument improper, insofar as a definite inconsistency with defendant's statement to Locallo was disclosed. See *People v. Beller* (1979), 74 Ill. 2d 514, 525, 386 N.E.2d 857; *People v. Sinclair* (1963), 27 Ill. 2d 505, 509, 190 N.E.2d 298; and *People v. Kent* (1973), 15 Ill. App. 3d 523, 526, 305 N.E.2d 42.

■ In his closing argument defense counsel himself commented upon defendant's pretrial statements, asserting their mutual consistency. Where there is testimonial evidence of contradictions between a defendant's separate stories, the State is entitled in rebuttal to reply to defense

counsel's arguments by showing that contradictory statements were in fact made. See *People v. Davis* (1974), 18 Ill. App. 3d 793, 310 N.E.2d 682; and *People v. Anderson* (1971), 48 Ill. 2d 488, 272 N.E.2d 18.

■ Nor do we find reversal required by the prosecutor's reference during initial closing argument to the omissions in defendant's statement to Gutrich. The State claims that any argument based upon these comments is waived by the failure of defense counsel to object at trial, citing *People v. Moore* (1973), 55 Ill. 2d 570, 304 N.E.2d 622, and *People v. Edwards* (1973), 55 Ill. 2d 25, 302 N.E.2d 306. In *People v. Hooker* (1977), 54 Ill. App. 3d 53, 57, 369 N.E.2d 147, however, it was observed that "[t]his court * * * has consistently recognized a *Doyle* violation as plain error. [Citations.]" This is true regardless of the giving or formal waiver of *Miranda* warnings (*Beller*, 74 Ill. 2d 514, 519-21; *People v. Bolden* (1978), 59 Ill. App. 3d 441, 453, 375 N.E.2d 898), and also where a defendant's silence is only partial (*People v. Robinson* (1976), 44 Ill. App. 3d 447, 449, 358 N.E.2d 43). As the court stated in *Bolden* (59 Ill. App. 3d 441, 454):

> "* * * an accused may not with impunity tell a jury that he had at all times offered the explanatory matter when he in fact had not done so, but his right to silence, whether in regard to the entire incident or details thereof, is constitutionally protected."

■ In the present case the prosecutor's comment in his initial closing argument upon defendant's partial silence in his statement to Gutrich was plain error and therefore properly reviewable regardless of the absence of objection below. Reversal is required, however, only if the error cannot be regarded as harmless beyond a reasonable doubt (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *Beller*, 74 Ill. 2d 514, 525). Recent Federal court construction of this standard in the context of *Doyle* rule violations has adopted the test set forth in *Anderson v. Nelson* (1968), 390 U.S. 523, 524, 20 L. Ed. 2d 81, 83, 88 S. Ct. 1133, 1134, wherein the court held that reversible error is committed "* * * where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal." See, *e.g., United States v. Sigal* (9th Cir. 1978), 572 F.2d 1320; *United States v. Parker* (9th Cir. 1977), 549 F.2d 1217, *cert. denied* (1977), 430 U.S. 971, 52 L. Ed. 2d 365, 97 S. Ct. 1659; *Scarborough v. Arizona* (9th Cir. 1976), 531 F.2d 959, 962.

In *Parker*, where the defendant had walked in front of the jury for the purpose of displaying his gold-capped tooth, a feature of his appearance which none of the eyewitnesses to the crime had testified to in identifying him, the prosecutor's comment upon the defendant's failure to state when the cap was put on was found to be an impermissible

reference to his silence. The error, however, was held to be harmless beyond a reasonable doubt because the comment was not extensive, did not stress any inference of guilt from his silence and there was no substantial evidence supporting acquittal. (549 F.2d 1217, 1221.) The presence of the same factors in *Sigal* was held sufficient to affirm defendant's conviction despite a prosecutor's reference in closing argument which "* * * constituted a comment on the failure of the [defendant] to testify, and thus [an] error of constitutional dimension." 572 F.2d 1320, 1323.

The factors relied upon in each of these cases to sustain a conviction in the face of a *Doyle* rule violation are all present in the case at bar. The prosecutor's comment in his initial closing argument upon defendant's failure to mention his visits to the restaurant and the racetrack earlier that evening in his statement to Officer Gutrich consists, in transcript form, of less than two lines in an 18-page presentation; no further reference to it was made. Nor, in light of defendant's failure to challenge the evidence of his guilt by producing any substantial alibi or other exculpatory evidence, can we find any substantial evidence supporting acquittal. Under these circumstances we find that the prosecutor's comment, though plain error, was harmless beyond a reasonable doubt.

Defendant further claims the jury was misled and prejudiced by the court's failure to give the "complete" Illinois Pattern Jury Instruction on circumstantial evidence. The shorter version of Illinois Pattern Jury Instructions, Criminal, No. 3.02 (1968), (hereinafter IPI Criminal) was given instead, reading as follows:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [the] [a] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict."

Defendant requested but was refused the following optional second paragraph from the same instruction:

> "You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

The committee note to this instruction provides that "[t]he second paragraph should be given only when the proof of guilty [*sic*] is *entirely* circumstantial." (IPI Criminal No. 3.02, Committee Note, at 21.) Defendant argues that the proof here is entirely circumstantial because no one, including Whorton, testified that he saw the crime committed.

The difficulty of effectively separating direct from circumstantial

evidence in the context of this instruction has often been observed. (See, e.g., *People v. Boose* (1978), 65 Ill. App. 3d 127, 382 N.E.2d 532; *People v. Uselding* (1976), 39 Ill. App. 3d 677, 350 N.E.2d 283.) Eyewitness testimony of a defendant's presence at the scene of the crime under suspicious circumstances, however, has been held to be sufficient direct evidence to make tender of the second paragraph inappropriate. (*Boose*, 65 Ill. App. 3d 127, 132; *People v. Jackson* (1976), 37 Ill. App. 3d 279, 285, 345 N.E.2d 509; *People v. Minish* (1974), 19 Ill. App. 3d 603, 606, 312 N.E.2d 49. See also *People v. Christiansen* (1969), 118 Ill. App. 2d 51, 57, 254 N.E.2d 156.) *People v. Hammers* (1976), 35 Ill. App. 3d 498, 341 N.E.2d 471, relied upon by defendants in this milieu, is distinguishable since there was no eyewitness testimony in that case placing the defendant at the scene of the crime.

■■ Even presuming error in the court's failure to include the second paragraph, reversal is not required unless justice has been denied or the verdict resulted from such error. (*Uselding*, 39 Ill. App. 3d 677, 683; *Hammers*, 35 Ill. App. 3d 498, 508; *People v. Merkel* (1974), 23 Ill. App. 3d 298, 302, 319 N.E.2d 77.) Defendant's only averment in this respect is that the jury "might well have relied" upon the reasonable theory that Whorton's identification of him was mistaken if the subject language had been included. The evidence as reviewed hereinabove does not establish this theory as reasonable. As the court observed apropos a similar contention in *People v. French* (1978), 59 Ill. App. 3d 353, 361, 375 N.E.2d 502, "\* \* \* there is no need for the jury or this court to speculate on other possible theories of innocence."

■■ Finally, defendant alleges that Anita Rest's testimony that she did not carry fire insurance on the building so inflamed and prejudiced the jury that he must be granted a new trial, citing *People v. Alward* (1933), 354 Ill. 357, 188 N.E. 425, and *People v. Gougas* (1951), 410 Ill. 235, 102 N.E.2d 152. Each of these cases involved evidence of insurance (in *Alward* on a building, in *Gougas* on the life of a murder victim) introduced for the purpose of showing the defendant had a motive for committing the crime. In the instant case, the record demonstrates that the building owner's testimony was introduced in order to show her lack of a motive for burning the building, a matter probative as to her lack of consent, which is an element of the crime charged. (Ill. Rev. Stat. 1975, ch. 38, par. 20—1(a).) Where evidence is relevant and otherwise admissible, it is not to be excluded because of a possible slight prejudicial effect. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.) Even if, as defendant contends, the evidence was wholly irrelevant because the question of the owner's intentions to burn the building was never explicitly raised, its effect on the jury was not significant in view of the probative evidence adduced and the absence of any emphasis upon it.

For the foregoing reasons the jury's verdict cannot be disturbed and defendant's conviction must be affirmed.

Affirmed.

STAMOS, P. J., and DOWNING, J., concur.