THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAWRENCE D. GERECKE, Defendant-Appellant.

Fourth District   No. 13366

Opinion filed February 3, 1977.

James Geis and Richard J. Geddes, both of State Appellate Defender's Office, of Chicago, for appellant.

Edwin R. Parkinson, State's Attorney, of Jacksonville (G. Michael Prall, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE CRAVEN delivered the opinion of the court:

On April 11, 1975, defendant Larry Gerecke was found guilty by a Morgan County jury for the murder of Charles "Booky" Howell and

attempt (murder) of Elva Gerecke Cockerham, defendant's former wife. Defendant was sentenced to concurrent terms of 75 to 100 years for murder and 50 to 100 years for attempt (murder).

Testimony at trial disclosed that defendant went to the South Side Tavern in Meredosia, Illinois, at about 11:15 p.m. on November 7, 1974. He had two mixed drinks while talking to the bartender. Defendant's ex-wife arrived, accompanied by "Booky" Howell. Defendant proceeded to play pool with Howell and had two to three more mixed drinks while playing. Defendant showed no animosity towards Howell at the time, the bartender testified. After Elva and "Booky" left, defendant remained, talking to Dennis Englebrecht, the bartender. Englebrecht closed the tavern at 12:15 or 12:30 a.m. and he and defendant drove around town until 1 a.m. drinking a six-pack of beer. While driving around they drove past Elva's apartment several times and once defendant commented that they weren't home yet. Defendant took Englebrecht home about 1 a.m.

Elva's testimony concerning the events at the tavern on that evening was essentially consistent with Englebrecht's testimony. She did testify, however, that once before they were divorced defendant threatened to kill her if she ever tried to take the children away from him. Elva then testified that after she and "Booky" left the tavern, they went to his house and watched T.V. for an hour; then, walking to her apartment, they saw defendant drive by in his car. Once at the apartment, they saw defendant drive by several more times and also saw him leave Pat Jobe's apartment next door. Elva and "Booky" then went to bed about 2 a.m. Soon thereafter Elva heard a knock on the door, then a knock on the window. "Booky" looked out and said, "It's Larry, you better see what he wants." She went to the back door where defendant appeared and said, "You went to bed with him didn't you." and "Where is he?" Defendant started to pull on the screen door and she slammed the inside wooden door and ran into the living room where "Booky" was sitting in a chair. "Booky" then ran into the kitchen. Elva heard a loud crash and saw defendant in the kitchen. While standing between the living room and kitchen Elva saw "Booky" throw up his hands and saw flames shooting from a long barreled gun held by the defendant. She then saw another flame shoot out of the gun and found that she was wounded.

Elva then ran to Pat Jobe's apartment next door and told Pat to call the police, that defendant had shot her and "Booky". She then ran back to her apartment and laid down on the floor next to "Booky" where she was discovered by two members of the Meredosia Rescue Squad at 3 a.m. "Booky" Howell was dead, lying face down in the kitchen, in a pool of blood with his right arm across Elva who was on the floor next to him.

Defendant was arrested about 3 a.m. after crashing his automobile into a school building. Defendant's breath smelled of alcohol, and a shotgun, a

six-pack of beer and a hunting vest containing shells were found in his car.

Defendant's mother and father testified that he came to their house that evening and borrowed his father's shotgun to go duck hunting. He returned later, running into the house and shouted, "They're shot, I caught them in bed, I'm going to kill myself."

Mary Grady, a neighbor of Elva's, testified that she heard three gunshots close together about 3 a.m.

Patricia Jobe testified that, as Elva's next door neighbor, she knew both Elva and the defendant. She testified that defendant was at her apartment about 1:30 to 2 a.m. and had about three beers. At 3 a.m. Elva ran into her apartment and asked her to call the ambulance because defendant had shot "Booky" and her.

The autopsy showed that Howell died of bleeding caused by a shotgun blast from a distance in excess of two feet. Expert testimony established that the muzzle was from five to nine feet from Howell when the shot was fired and that three spent shells found in Elva's apartment had been fired from the gun in the defendant's car. Defendant's father identified that gun as the one defendant had borrowed from him on the night in question.

Defendant testified in his own defense. His testimony was consistent with that of Englebrecht as to the events prior to 1 a.m. After dropping off Englebrecht, defendant purchased another six-pack and went to Pat Jobe's apartment where, while talking to her for 30 to 45 minutes, he consumed three to four more beers. Defendant then decided to go duck hunting, went home, borrowed a shotgun from his father and picked up a hunting coat with shells in it. The defendant then testified that he was lonely and went to Elva's apartment to talk. He left the gun in the car and knocked on the door, then the window. Seeing Howell in the window, defendant got mad. He got the gun because he was scared and thought there would be trouble since he caught "Booky" and Elva there together. He loaded three shells in the gun on the way to the house.

Defendant then testified that Elva slammed the door in his face when he told her he would get the kids since he caught them there together. Defendant asked, "Where is he?" and broke down the door. Once inside, the defendant maintains that Howell yelled at him, grabbed him and hit him. This led defendant, according to his testimony, to run out and get his gun which had been propped near the back door. While coming in the door, the gun accidentally hit the door and discharged. When defendant pointed the gun at "Booky", "Booky" hit him and the gun went off accidentally hitting Elva. Defendant then shot "Booky" because he was mad that Elva had been shot and because he was afraid of "Booky". On cross-examination, defendant admitted that at no time did he think that "Booky" was armed.

Defendant then drove home, ran into the house and yelled that he had

caught them in bed and shot them and that he was going to kill himself. He then drove the car into the school building in an unsuccessful suicide attempt and was apprehended soon thereafter.

■■ First, defendant contends that he was denied a fair trial because of the introduction of five color photographs of the deceased: two taken at the scene, three taken at the morgue. Defendant maintains that these pictures were so gruesome, inflammatory and irrelevant as to become inadmissible according to the guidelines established in *People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827. *Lefler* recognizes that admission of photographs is within the discretion of the trial court but is distinguishable from this case. In *Lefler,* the trial court permitted the introduction of color photos taken during the process of autopsy. The pictures were projected on a 44″ x 26″ screen and showed the chest cavity after bone, blood vessels and organs had been removed. Other photos showed the skull and brain after portions of the skull had been removed. The supreme court stressed that these pictures had little evidentiary value because "the gruesome nature of the pictures was caused almost entirely by the autopsy procedure." (38 Ill. 2d 216, 222, 230 N.E.2d 827, 830.) Unlike in *Lefler,* the pictures here actually depicted the wound made by the shotgun blast, not those made by a pathologist's scalpel.

The rule is that where photographs are relevant to establish any fact in issue, they are admissible, in spite of the fact that they may be gruesome. (*People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208, *rev'd on other grounds,* 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279; *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27.) Here the photos were relevant to prove the cause of death and the identity of the victim. They did not, however, become unnecessarily cumulative because there was oral testimony concerning the same issues. (*Henenberg.*) For these reasons the photographs were properly admitted.

Second, defendant contends that closing remarks by the prosecutor denied him a fair trial. Specifically, defendant refers to prosecution remarks: (1) attacking defense counsel's courtroom style; (2) emphasizing that defendant, not the prosecution, had raised the manslaughter defense; and (3) imploring the jury to put the manslaughter instructions out of their minds. Defendant argues that these remarks were prejudicial because they maligned defendant for exercising his right to have the jury instructed on his theories of the case, told the jury to ignore the court's instructions and negated defendant's presumption of innocence by arguing that the jury could only choose between guilty verdicts.

Defense counsel made no objections to any portion of prosecutor's closing argument. Ordinarily, failure to object to allegedly prejudicial closing arguments waives the issue for purpose of appeal. (*People v. Edwards* (1973), 55 Ill. 2d 25, 302 N.E.2d 306, *cert. denied,* 415 U.S. 928,

39 L. Ed. 2d 486, 94 S. Ct. 1438; *People v. Moore* (1973), 55 Ill. 2d 570, 304 N.E.2d 622.) However, if the remarks of the prosecutor were so prejudicial as to deny defendant a fair trial or were so flagrant as to threaten deterioration of the judicial process, then we would be obliged to reverse even though no objection was made to the remarks at trial. *People v. Moore* (1956), 9 Ill. 2d 224, 137 N.E.2d 246.

■■ Here the prosecutor's remarks were not so prejudicial as to deny defendant a fair trial. The prosecutor's remarks were fair comment on the evidence and did not mislead the jury as to what verdicts they could return. Furthermore, as in *People v. Moore* (1973), 55 Ill. 2d 570, 304 N.E.2d 622, defense counsel's failure to object to the purported improper comments did not result from his inability to perceive the possible inferences conveyed. Here, defense counsel, as a matter of trial tactics, chose to rebut the prosecutor's comments in his own closing remarks. In response to the prosecutor's remarks about defense counsel's objection, defense counsel explained to the jury that lawyers only object to protect the rights of their clients. He admonished the jury that his objections held no significance. In response to the prosecutor's arguments that defense counsel brought up the voluntary manslaughter theory, defense counsel explained that defendant was merely exercising his right to tell his version of the facts and that the jury was to choose its verdict based on the evidence.

Without substantial prejudice to the accused, allegedly improper remarks of counsel cannot constitute reversible error. (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied*, 398 U.S. 954, 26 L. Ed. 296, 90 S. Ct. 1881.) We conclude that any remarks made by the prosecutor in closing argument did not significantly influence the resultant verdict.

Third, defendant argues that the jury was improperly instructed with respect to murder. Defendant arguably had testified to facts supporting three theories consistent with a verdict of not guilty of murder: (1) that he acted justifiably in self-defense; (2) that he unreasonably believed that he was acting in self-defense; and (3) that he acted under sudden and intense passion resulting from serious provocation. The jury was instructed as to justifiable defense of person, "sudden and intense passion" manslaughter, and "unreasonable self-defense" manslaughter. In addition, the following murder instructions were given in accordance with IPI Criminal Nos. 7.01 and 25.05:

> "A person commits the crime of murder who kills an individual if, in performing the acts which cause the death, he intends to kill or do great bodily harm to that individual.
>
> To sustain the charge of murder, the State must prove the following propositions:

*First*: That defendant performed the acts which caused the death of Charles 'Booky' Howell, Jr.

*Second*: That when the defendant did so, he intended to kill or do great bodily harm to Charles 'Booky' Howell, Jr.

*Third*: That the defendant was not justified in using the force which he used.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty."

On appeal, defendant argues that the murder instructions were deficient for not including the following two suggested propositions:

"*Fourth*: That the defendant did not believe that circumstances existed which would have justified killing Charles 'Booky' Howell, Jr.; and

*Fifth*: That when the defendant did so he was not acting under a sudden and intense passion resulting from serious provocation by Charles 'Booky' Howell, Jr."

It is defendant's contention that the jury was never informed that a conviction of murder necessitates proof beyond a reasonable doubt of the absence of circumstances reducing the offense to manslaughter, *i.e.*, unreasonable self-defense and sudden intense passion resulting from serious provocation. Defendant argues that the jury could have, according to the instructions given them, found defendant both guilty of murder and voluntary manslaughter and having no guidance with which to choose between the verdicts.

The State contends that any error with respect to the instructions was waived since defendant made no objections at trial. (*People v. Mallett* (1970), 45 Ill. 2d 388, 259 N.E.2d 241; *People v. Robinson* (1974), 21 Ill. App. 3d 343, 315 N.E.2d 95.) In fact the murder instruction defendant now complains of was tendered by the defense. As a general rule, defendant may not complain of defects in instructions given at his request. *People v. Riley* (1964), 31 Ill. 2d 490, 202 N.E.2d 531.

■■ Ordinarily, this would be a simple case of waiver; however, Supreme Court Rule 451(c) states: "Instructions in criminal cases shall be tendered, settled, and given in accordance with section 67 of the Civil Practice Act, but substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." (Ill. Rev. Stat. 1975, ch. 110A, par. 451(c).) This rule relaxes the waiver doctrine with respect to jury instructions whenever there are substantial defects in the

instructions rising to the level of plain error. In making that determination we are cognizant of the rule that a jury is properly instructed if all the instructions, construed as a whole, properly inform the jury of the applicable law. (*People v. Jones* (1975), 26 Ill. App. 3d 78, 325 N.E.2d 56.) We are persuaded by the State's argument that any inconsistency between the murder and manslaughter instructions is cleared up by the closing arguments of counsel. The prosecutor told the jury that they must decide whether it was murder or manslaughter and that the jury could not return a verdict finding the defendant guilty of both. Defense counsel also explained to the jury that if they found that defendant believed he was justified in the use of force but his belief was unreasonable, they should return a verdict of manslaughter. He also informed the jury that if they believed defendant was acting under a sudden and intense passion at the time of the killing they should return a verdict of voluntary manslaughter; subsequently, it is clear that the jurors were adequately informed by counsel that they must return verdicts of either murder, manslaughter, or not guilty. They were also adequately informed that if the defendant was acting under a sudden and intense passion or unreasonable belief that he was justified in using deadly force, that a manslaughter verdict was the proper one.

■■ For these reasons, we do not believe that errors in the instructions were serious enough to require relaxation of the waiver rule. In addition, we are convinced that the evidence of guilt for murder and attempt (murder) was so overwhelming that a jury could not have reasonably found to the contrary. *People v. Truelock* (1966), 35 Ill. 2d 189, 220 N.E.2d 187.

Considering that the gun involved here was a pump action shotgun, defendant's testimony was patently unbelievable. First of all, defendant testified that he went to his parents' home at 3 a.m. to get a gun to go "duck hunting." Then defendant went directly to his ex-wife's apartment and carried the gun with him to the door instead of leaving it in the car. This, too, tends to disprove any theory of accidental shooting or self-defense since defendant testified that he at no time believed Howell to be armed. Also, defendant contended that the gun accidentally discharged as he entered the apartment, coincidentally shooting the lock off a locked door. Then, contrary to Elva's testimony, defendant testified Howell rushed him and pushed the gun aside causing it to fire and wound Elva. Defendant then claimed Howell attacked him again, at which time defendant shot Howell because he was afraid Howell, although unarmed, was going to kill him. To believe defendant, one must assume that an unarmed man would attack a man with a 16-gauge shotgun. Also in order for these events to have transpired, defendant would have had to pump the shotgun before shooting the lock off the door, again before

accidentally shooting Elva, and again before shooting Howell. We find defendant's account of these events unreasonable; therefore, any error with respect to instructions was harmless.

Finally, defendant contends that the sentences imposed were excessive and should be reduced. Concededly, 75 to 100 years for murder and 50 to 100 years for attempt (murder) are well above the statutory minimums. Also, as defendant points out, he had no prior criminal record and had maintained relatively steady employment.

We recognize that sentences within the statutory limits are only interfered with by reviewing courts in those instances where the sentence constitutes a great departure from the spirit and purpose of the law. (*People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673.) This court's authority to reduce sentences under Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1975, ch. 110(a), par. 615(b)(4)) must be applied with considerable caution and circumspection since the trial judge is in a better position to make a sound determination concerning the sentence to be imposed. *People v. Caldwell* (1968), 39 Ill. 2d 346, 236 N.E.2d 706.

■■■ It must be noted that at the sentencing hearing the judge asked for presentation of evidence in aggravation and mitigation. None was presented. Therefore, the judge was aided entirely by the arguments of counsel and the usual presentence report. This was sufficient, contrary to defendant's contention on appeal, to allow the judge to make a proper sentencing determination. With respect to the sentences themselves, we cannot say that their length is clearly disproportionate to the severity of the crime. While it is true that defendant had no prior record, considering the brutality and seriousness of these crimes, we cannot say that the sentences imposed were an abuse of discretion.

For these reasons the judgment of the trial court is affirmed.

Judgment affirmed.

GREEN and MILLS, JJ., concur.