THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DONALD E. NOBLES, Defendant-Appellant.

Fourth District   No. 15396

Opinion filed April 1, 1980.

712

TRAPP, J., specially concurring.

Richard J. Wilson and Daniel D. Yuhas, both of State Appellate Defender's Office, of Springfield, for appellant.

Patrick M. Walsh, State's Attorney, of Decatur (Gary J. Anderson and Martin N. Ashley, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

After a joint trial by jury in the circuit court of Macon County, defendant Donald E. Nobles was convicted of the April 4, 1978, murders of Rosalyn Nesbitt and Clyde Davis and on December 15, 1978, sentenced to concurrent terms of imprisonment of 40 years and natural life respectively.

Defendant appeals asserting that: (1) the trial court erred in denying him a continuance; (2) both convictions should be reduced to voluntary manslaughter because the evidence showed that he unreasonably believed the killing was necessary to defend himself; (3) exclusion of veniremen who were dismissed because of their views of the death penalty deprived him of a jury from a representative cross-section of the community to determine the issue of his guilt or innocence; (4) the statutory provision for imposing imprisonment for natural life is so vague and ambiguous as to be unconstitutional; (5) imposition of a sentence for natural life violates the Illinois Constitution of 1970; and (6) his sentences should be reduced because his conduct resulted from a long history of drug abuse.

Because most of defendant's contentions do not concern the proof of his guilt or innocence we will refer to the evidence only during discussion of the points to which it relates.

Defendant was represented at trial by lawyers Paul Brayman and Stanley Hill. On the first day of trial the defense made a request for a three-day continuance to permit Mr. Brayman to attend the funeral of his mother. The request was denied and the trial proceeded with Mr. Brayman absent during the selection of the first eight jurors. Pointing out that jury selection is a crucial part of the trial of a criminal case, defendant maintains that the denial of the continuance deprived him of a fair trial.

In *Giacalone v. Lucas* (6th Cir. 1971), 445 F.2d 1238, the following were deemed to be factors to consider in determining whether a

defendant had been deprived of a fair trial when a continuance had been denied because of the unavailability of counsel: (1) the length of the delay that would be required; (2) whether co-counsel was available to try the case; (3) whether prior continuances had been granted; (4) the inconvenience to the parties and witnesses; and (5) whether the request is dilatory. Here, the request was obviously not dilatory. However, Mr. Hill was available to represent the defendant. He appeared to be fully familiar with the case and continued to take an active part in the trial after Mr. Brayman returned. Moreover, various previous continuances had been granted. Three of them were at defendant's request and a fourth was nominally at the State's request but actually arose because of an unavailability of defense counsel. Even a three-day continuance of a complicated jury trial inherently imposes inconvenience on the parties, witnesses and court.

■■■ The supreme court has held the denial of a continuance because of unavailability of counsel to be proper when co-counsel was available to adequately try the case in *People v. Miller* (1958), 13 Ill. 2d 84, 148 N.E.2d 455, and *People v. Davis* (1950), 406 Ill. 215, 92 N.E.2d 649. Ordinarily the failure to grant a continuance will not be held to be error unless there is a clear showing of an abuse of discretion (*People v. Gray* (1978), 61 Ill. App. 3d 243, 377 N.E.2d 1311). No such showing was made here. No error resulted from the denial of the continuance here.

At trial defendant admitted the killings but asserted that he was not guilty by reason of insanity. Both killings involved bizarre circumstances and testimony indicated that defendant had a feeling that others were out to get him. The opinion testimony concerning his sanity was conflicting but he asserts that it proved, as a matter of law, that he could only be guilty of voluntary manslaughter as to each victim. He relies upon section 9—2(b) of the Illinois Criminal Code of 1961 which provides that:

> "A person who intentionally or knowingly kills an individual commits manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing * * * but his belief is unreasonable." (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b).)

He maintains that the evidence showed conclusively that because of his mental condition he had an unreasonable belief that circumstances existed which would exonerate or justify the killings. He requests that we reduce the murder convictions to those for voluntary manslaughter.

■■ The theory that an accused's mental abnormality can create a condition whereby he would have the type of unreasonable belief described in section 9—2(b) is authoritatively recognized. (See LaFave & Scott, Criminal Law §42, at 329 (1972).) No Illinois cases on the question have been called to our attention. We need not decide whether this theory

has application within the framework of the Illinois Criminal Code of 1961 because the evidence here was insufficient to require a determination that defendant had such a condition or such a belief.

Defendant testified that he drove into Decatur with Rosalyn Nesbitt, a girlfriend of his, sitting beside him as a passenger. Upon entering the city he became convinced that a car was following him. He claimed to have gotten away from the car by running two red stoplights. He stated that then:

> "Rosalyn started moving away * * * as if she was going to do something * * *. She was looking at me real funny * * *. The next thing I know I stopped the car * * * and started shooting. Then I ran to my aunt's house. I took the gun and threw it in the bushes and I went knocking on the door. * * * Uncle Jim * * * started telling me 'Donald, sit down on the couch and let me talk to you.' "

On cross-examination, defendant admitted that he knew Nesbitt was unarmed and that she had merely been bothering him.

Following defendant's arrest for the Nesbitt homicide, he was placed in a jail cell with Clyde Davis, a thin frail man who was uncommunicative. Shortly thereafter, while the two were unattended, defendant choked Davis and banged his head against a wall, killing him. On direct examination defendant attributed the killing to the jail attendant's having brought something to Davis which defendant thought was intended to harm him. On cross-examination, however, he admitted that Davis never said anything to him nor made threatening gestures toward him.

Moreover, Dr. Kiersch testified that defendant admitted to him that he "acted and played crazy." Defendant's theory that he had a cocaine-induced psychosis was countered by several State's experts who testified that cocaine usage would not produce such a result. Thus, in any event, the jury could have rejected defendant's theory. We reject his request that the convictions be reduced.

■ Systematic exclusion of a segment of the community from jury service based upon race and sex has been held to work a deprivation of due process to persons on trial charged with a crime. (*Hernandez v. Texas*(1954), 347 U.S. 475, 98 L. Ed. 866, 74 S. Ct. 667; *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct 692.) Defendant asserts that he was similarly deprived here by the trial court's excusing seven prospective jurors because of their *voir dire* statements that they could under no circumstances impose the death penalty. He maintains that exclusion of those people resulted in a "conviction prone" jury because the most humane elements of the population were systematically excluded.

In *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, the practice of excluding jurors in capital cases merely because of an expression of conscientious scruples against the death penalty was held to be constitutionally improper because it tended to produce an unduly death-prone jury, requiring reversal of the death sentences imposed. However, the court rejected the argument that such a jury would also be unduly conviction-prone, stating that insufficient data was then available to prove such a contention. We recently passed upon this same question in *People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, 387 N.E.2d 1284. In a split decision we noted that the theory had been rejected in other cases, including most recently *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537. We concluded that although some new data in support of the theory was available, we did not deem it sufficient to overturn the precedent. We follow our decision in *Kirkpatrick* and deem no error to have occurred on this issue.

■ We find no merit in defendant's theory that the statute permitting the court to impose imprisonment for a defendant's natural life is so vague and ambiguous as to be unconstitutional. The authority to do so arises from section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—1(a)(1), which states:

> "(a) A sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:
>
> (1) for murder, a term shall not be less than 20 years and not more than 40 years, or, if the court finds that the murder was accompanied by *exceptionally brutal or heinous behavior indicative of wanton cruelty* or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment." (Emphasis added.)

Defendant maintains that the italicized words lack the constitutionally required degree of precision.

In *Grayned v. City of Rockford* (1972), 408 U.S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294, the court described the important considerations in determining whether legislation proscribing conduct is void for being vague and indefinite to be whether: (1) it gives reasonable guidance to the average person; (2) it is designed in such a way as to avoid arbitrary and discriminatory enforcement; and (3) whether sensitive first amendment rights are involved and thus requiring a higher standard.

In *Giaccio v. Pennsylvania* (1966), 382 U.S. 399, 15 L. Ed. 2d 447, 86 S. Ct. 518, defendant was acquitted of discharging a firearm at another individual because he was shown to have used a starter pistol. Nonetheless the jury was given unbridled discretion under an 1860

Pennsylvania statute to impose costs on the defendant, which the jury did. The assessment of costs was held unconstitutional because the authorizing statute failed to indicate to the public and to the trier of fact the type of conduct prohibited.

In *People v. Parkins* (1979), 77 Ill. 2d 253, 396 N.E.2d 22, the supreme court reviewed section 1—1(2) of "An Act to prohibit the use of telephone and telegraph lines for the sending of certain messages, to prevent harassment by the use of the telephone communications, and to provide a penalty for violation of the Act" (Ill. Rev. Stat. 1977, ch. 134, par. 16.4—1(2)), which provides:

> "Harassment by telephone is use of telephone communication for any of the following purposes:
> * * *
>
> (2) Making a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number; * * *."

The court noted a previous case where a statute making similar conduct with the intent to "annoy" had been held void for vagueness (*People v. Klick* (1977), 66 Ill. 2d 269, 362 N.E.2d 329). It concluded, however, that the word "harass" when used with "abuse" and "threaten" took on a sufficiently definite meaning.

Here, unlike in *Parkins*, no first amendment rights are involved. The totality of the words used together requiring either the "brutal" or the "heinous" behavior to indicate "wanton cruelty" gives reasonable guidance to the average person and is of a design which would tend to avoid arbitrary enforcement. Moreover, we note that the sentence here is justified by the provisions of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 9—1) which lists as an aggravating factor "3. the defendant has been convicted of murdering two or more individuals * * *." Thus, a showing of "brutal" or "heinous" behavior was not statutorily necessary to impose the natural life sentence.

Article I, section 11, of the Illinois Constitution of 1970 provides:

> "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

Defendant maintains that imposition of a sentence for natural life offends this because it makes impossible the "restoring of the offender to useful citizenship." Interpretation of this provision is made difficult by the fact that section 11 was a floor amendment without any committee report (3 Record of Proceedings, Sixth Illinois Constitutional Convention 1391). Delegate Leonard Foster who proposed when asked upon the floor as to whether this section would preclude the death penalty responded:

> "I don't think this would necessarily preclude the death penalty,

although I wish it could * * *. I think the judge should be required to consider the use of parole, probation * * *."

If the death penalty which makes impossible the restoration of the offender to useful citizenship is not precluded, then the life imprisonment of the offender would not be precluded either.

■■ Finally, we do not deem defendant's long history of drug use to require that his sentence be reduced. In *People v. Walcher* (1969), 42 Ill. 2d 159, 246 N.E.2d 256, and *People v. Mayhone* (1970), 124 Ill. App. 2d 369, 260 N.E.2d 451, long indeterminate murder sentences have been reduced on appeal where alcoholism was shown to have borne substantially upon the defendant's conduct. Here, although defendant's conduct was shown to be most bizarre, the evidence was conflicting as to the extent to which his drug use contributed to his conduct. Much evidence attested to his antisocial personality. No indication was given of his having substantial rehabilitation potential. Under these circumstances, very long murder sentences have been upheld. *People v. Wright* (1978), 57 Ill. App. 3d 940, 373 N.E.2d 753; *People v. Gerecke* (1977), 45 Ill. App. 3d 510, 359 N.E.2d 1178.

The convictions and sentences appealed are affirmed.

Affirmed.

MILLS, P. J., concurs.

Mr. JUSTICE TRAPP, specially concurring:

Since the issue is not directly addressed in the opinion, I concur specially in the affirmance of the convictions and sentences to address defendant's argument that as a matter of law the murder conviction should be reduced to voluntary manslaughter because the evidence disclosed that by reason of mental abnormality defendant had an unreasonable belief that the use of deadly force was necessary within the meaning of section 9—2(b) of the Criminal Code of 1961. Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b).

If such hypothesis is developed into law, a person charged with murder who has been found to be sane under section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 6—2) may nevertheless present some evidence of mental abnormality and become entitled to an instruction upon voluntary manslaughter asserted to exist because the abnormality *alone*, and without the *imminent* threat of death or great bodily harm, gave rise to the unreasonable belief that use of great bodily force by defendant was justified. See *People v. Roberson* (1980), 83 Ill. App. 3d 45, 403 N.E.2d 490; Ill. Rev. Stat. 1977, ch. 38, par. 7—1.

Upon the trial here, the issue of defendant's sanity at the time of the offense was put into issue by expert and lay testimony for both the prosecution and the defense. The trial court found that defendant was sane, and we cannot find that that specific finding has been challenged.

In Illinois, sanity as a measure of criminal responsibility is placed in issue under the provisions of section 6—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 6—2(a)), which provides:

> "(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

The Committee Comments (Ill. Ann. Stat., ch. 38, par. 6—2, at 326-29 (Smith-Hurd 1972)), in sum, note that the statute was designed to remove the limitation of the M'Naghten rules historically used in the determination of sanity as a measure of criminal responsibility. Those comments point out that a characteristic of M'Naghten is "the requirement of *total incapacity* to know that the conduct was wrong or the *total incapacity* to control behavior." (Emphasis added.) (Ill. Ann. Stat., ch. 38, par. 6—2, Committee Comments, at 328 (Smith-Hurd 1972).) It is apparent that the Illinois Code is much less demanding in developing the defense of insanity than the evidence required under M'Naghten.

In LaFave & Scott, Criminal Law §42, at 329 (1972), cited in the majority opinion, discussion is directed to an abnormal mental condition which does not amount to legal insanity under the M'Naghten rules.

It is notable that the cases which admit evidence of an abnormal mental condition that is insufficient to show legal insanity but which is sufficient to support an instruction on voluntary manslaughter measure legal insanity by M'Naghten rather than by a statute which denies criminal responsibility where there is a lack of "substantial capacity either to appreciate the criminality of his conduct or conform his conduct to the requirement of the law." (*People v. Wells* (1949), 33 Cal. 2d 330, 202 P.2d 53; *People v. Conley* (1966), 64 Cal. 2d 310, 411 P.2d 911, 49 Cal. Rptr. 815; *People v. Castillo* (1969), 70 Cal. 2d 264, 449 P.2d 449, 74 Cal. Rptr. 385; *State v. DiPaolo* (1961), 34 N.J. 279, 168 A.2d 401.) In *DiPaola*, the court specifically refused to discard the M'Naghten rules as the test of legal insanity.

In *Conley*, the Supreme Court of California discussed its form of "partial responsibility" at some length. Defendant was charged with murder in the first degree and he was found to be "sane" under the applicable M'Naghten rules. Upon appeal it was contended that there was evidence of such degree of intoxication that it was error to refuse an instruction on voluntary manslaughter. In Illinois intoxication may be a

separate defense under section 6—3 of the Criminal Code of 1961. (Ill. Rev. Stat. 1977, ch. 38, par. 6—3.)

From that opinion we find that in California "malice aforethought" is an essential element of murder. The term is distinguished from "intent" to kill and cases are cited to establish that there may be an intent to kill without the presence of the necessary "malice aforethought."

In the opinion the term "malice aforethought" is stated to include as an element the determination that the defendant is aware that society requires him to conform his conduct to the requirements of the law and is able to comprehend that the act performed is prohibited. In essence, the concepts so stated are within our statutory definition of insanity.

So, as in LaFave & Scott, at page 330, it is said that the evidence of an abnormal mental condition supporting an instruction for voluntary manslaughter where the charge is murder is "this new mitigating circumstance [which] concerns an absence of self-control such as would likely afford a complete insanity defense under any of the extant insanity tests except M'Naghten," and which takes "account of inability to conform his conduct to the requirements of the law adopted in a jurisdiction where M'Naghten is the sole test for insanity and where departure from M'Naghten is believed to be a matter for the legislature."

Here, the evidence which is said to possibly support the giving of a manslaughter instruction has been once considered upon the issue of insanity. The defendant was found to be sane in the sense that he was capable of appreciating the criminality of his conduct and capable of conforming his conduct to the requirements of the law within the terms of the Illinois statute.

The Illinois statute has abandoned M'Naghten and its interpretation and the concepts included in the doctrine of "partial responsibility" have been incorporated in the statutory defense of insanity. Where the defense of insanity is available to the defendant or has, in fact, been presented to the trier of fact, this court should not inject unnecessary and redundant concepts into the statutory definition of voluntary manslaughter as defined in section 9—2(b). Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b).