THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ARTHUR MERCHEL, Defendant-Appellant.

Fifth District    No. 79-426

Opinion filed November 26, 1980.

John H. Reid and Richard J. Bennett, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Arthur Merchel, of Menard, for appellant, *pro se*.

James E. Dull, State's Attorney, of Mt. Vernon (Martin N. Ashley and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mme JUSTICE SPOMER delivered the opinion of the court:

Defendant, Arthur Merchel, was convicted following a bench trial of the murder of Rodney Winfree. Pursuant to section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)), the sentencing judge found that the murder "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty," and on that basis sentenced the defendant to a term of natural life imprisonment. On appeal, defendant challenges the constitutionality of the natural life provision and the appropriateness of its application to his individual case.

The record reveals that defendant, convicted of forgery, was to turn himself in to authorities before December 28, 1978, in order to begin serving a term of imprisonment for that offense. On the morning of December 27, a friend, Charles Strope, came to defendant's apartment, in defendant's words, "to drink, 'cause it was my last day before I started serving my time." Strope was later given prosecution immunity for the occurrences of December 27 in exchange for his testimony, and his description of those events generally corresponded to that of defendant.

Strope testified that he had known defendant for about a year and they frequently went out drinking. At approximately 9 a.m. on December 27, he and the defendant drove from defendant's apartment to the Mt. Vernon Fairgrounds. Defendant spoke to several of the men working there, one of whom was Rodney Winfree. After a while, Strope and defendant left, but then returned to the fairgrounds again at about 11 a.m. Winfree got into the car with the two, and they drove to his house so Winfree could get money to buy some liquor. Before he left, Winfree told his boss that he would not be returning to work that day.

The three men spent 20 minutes at Winfree's residence. Winfree's wife testified that while the men were there defendant "kept saying that he wanted ten dollars and that if he didn't get it, he was going to beat the shit out of Rod." Mrs. Winfree gave her husband his billfold and a check for $80, which he was to cash at the bank in order to pay defendant the $10 and so Mrs. Winfree could commute to work.

The three men proceeded to a bank in Mt. Vernon at about 12 noon,

where Winfree deposited $60 of the check his wife had given him. The men then went to a liquor store, where they bought two 12-packs of beer, and then continued to Winfree's sister's house at Winfree's behest. While there, something was said that upset the defendant. He described the visit in his testimony:

> "We—I pulled up in the driveway; we all went in. I don't know who it was he was going to see or what, and he had mentioned some names that didn't strike well with me or Chuck, cause [*sic*] when the names was mentioned, I told Chuck, let's go, and he motioned his head, yeah, let's go. There was tension there, and from there we proceeded just ride around, wound up down at Nason."

During cross-examination defendant identified the name mentioned as Jewel Rich, and explained that had upset him because, "I had punched Jewel in the nose at the Spot Tavern here while [ *sic* ] back, and at that time I had heard that they was out to get me." Rich had also been involved in the forgery for which defendant was about to be incarcerated, but defendant denied that he thought Rodney was "setting him up:" "No, sir, I didn't think nothing like that. It just kind of hit me wrong, and we got in the car and left."

The three men drove south out of Mt. Vernon until they stopped at a cemetery in Nason, Illinois, where defendant's father was buried. After a few minutes the men drove away; Winfree said that he wanted to return to town, but the defendant said that he wanted to talk to him.

Defendant then drove to the Blue Gill Hole access area adjoining Rend Lake. Strope got out of the car and went to the bathroom; the other two men also got out of the car. When Strope returned, he heard Winfree ask the defendant, "What's the matter, what's wrong, what's the matter with you, or something." Strope then heard the defendant say that he wanted to talk to Winfree. The next thing Strope heard was "the sounds of the scuffle or fight." Strope turned and saw the defendant standing over Winfree, who was lying on the ground. He testified that defendant had apparently just hit Winfree, and that Winfree's face was bloody. Winfree then tried to get away, moving toward the woods. Defendant caught up with him, and the two men struggled down the hill toward the lake. Strope did not see Winfree hit the defendant at any time, as Winfree was trying to get away while defendant was hitting him.

Strope followed the two men down the hill, where they stopped approximately 10 feet from the lake. Defendant was still hitting Winfree. Strope testified that he went over to defendant and said, "What in the hell are you doing to this guy?" Defendant replied, "Hey, I'm not done talking to him." Winfree was then lying on the ground, and defendant was standing over him, striking him with his fist and kicking him in the ribs.

Strope testified that as defendant administered the beating, Winfree appeared to be in a "state of semi-consciousness, bloody, his face and head was pretty bloody." Strope could not determine whether there were any wounds on Winfree's face or head, because the victim's head was "pretty well covered with blood."

Strope then returned to the car. About three minutes later, and some five to seven minutes after the men had arrived at the Blue Gill Hole, defendant returned to the car as well. He was wet and muddy. Strope asked where Winfree was, and defendant replied, "I knocked the son of a bitch out down there. He'll get a—he'll get a ride back to town." The two men then left the area.

Defendant gave a statement to police, and later testified, about the beating at Blue Gill Hole. In his statement, defendant said that he and Rodney Winfree engaged in name-calling, whereupon Winfree tried to kick him in the groin. Defendant explained what he then did:

> "I then went to the car and got a tire tool out of the back floor board [sic] and hit Rodney in the back of his head. Rodney fell to the ground and I kicked him a few times. While I was kicking Rodney, Chuck came over and grabbed my arm and said let's go. Chuck and myself then got back into my car and we left."

Defendant's testimony at trial differed from his statement to police. He testified that a fight began between Charles Strope and the victim, that he had tried to stop it, and that he had become involved, hitting the victim with the tire iron only after the victim tried to kick him.

After the defendant and Strope left Blue Gill Hole, they soon stopped so they could go to the bathroom, and defendant said, "I think I might have killed him." Defendant then took off his muddy boots and threw them away. The two men drove to Mt. Vernon, where defendant purchased some beer. On reflection, Charles Strope found this unusual, because he had been under the impression that defendant had no money.

The body of Rodney Winfree was found by an employee of the Department of Conservation on December 28, the day after the beating. He found the body lying face down, the head in the water, with the feet just barely out of the water, touching the edge of the shore. When law enforcement officers arrived, they recovered the victim's wallet, which was on the ice some 20 feet from shore. A bank deposit slip was also found.

An autopsy of the body was performed by Dr. James Miller, a pathologist. He concluded that the cause of death was extensive injury to the brain (cerebral trauma) and the attendant swelling of the brain caused by the injury (cerebral edema). He concluded that the deceased was dead before his body entered the water.

Dr. Miller described abrasions, bruises, and lacerations on the back

of the victim's hands, on his arms, his hips, and his face. He concluded that the wounds and bruises along the outer surface of both arms reflected "a defensive act rather than an aggressive act"—as if the victim were trying to ward off blows. Dr. Miller noted that the abrasions and wounds to the face and head were quite extensive. The autopsy revealed a "rather extensive hemorrhage in the posterior portion of the brain," accompanied by swelling of the brain's surface. There were also two lacerations on the side of the deceased's head, one of which extended "down to the skull." Both blows contributed to the cause of death.

Following defendant's conviction for murder, a sentencing hearing was held on July 2, 1979. No evidence in aggravation or mitigation was presented, and the prosecution recommended imposition of a natural life sentence. The trial court imposed that sentence. In the written judgment order, the court found that no mitigating factors were present, and found the following factors in aggravation: (1) defendant inflicted serious bodily injury; (2) defendant received compensation for committing the offense; (3) defendant had a prior history of criminal activity; and (4) the sentence was necessary to deter others. The judgment order also indicated that defendant was sentenced to a term of natural life imprisonment because the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

■■ Following the filing of briefs on behalf of both parties in this court, the defendant *pro se* filed a supplemental brief, arguing that he was deprived of due process of law where the State elicited his waiver of *Miranda* rights by informing him that they were merely investigating a beating, when they knew the victim had died. We address this contention first.

Following discovery of the victim's body and preliminary investigation, two police officers questioned the defendant at the Vandalia Correctional Center. The officers told defendant they were investigating a beating, and Officer Ray Bradford testified as follows:

"Q. And in that conversation did you ever inform Mr. Merchel that you had seen Rodney Winfree?

A. Yes.

Q. Did you inform Mr. Merchel that you had spoken to Rodney Winfree?

A. No.

Q. Did you mention to Mr. Merchel that Rodney Winfree was dead?

A. No, I did not.

Q. But did you mention to him that you had seen Rodney Winfree?

A. I didn't; I believe Ron Massey did.

Q. Did you intentionally, through your conversation, attempt to deceive Mr. Merchel as to whether or not Mr. Winfree was dead or alive?

A. No."

The defendant waived his *Miranda* rights prior to questioning. However, on appeal he asserts that the officers elicited the waiver of *Miranda* by not fully informing him of the nature and purpose of the questions. He argues that interrogation encompasses not only questioning, but also psychological tactics designed to elicit a response to questioning or to undermine the suspect's will to resist.

We note that this matter was not raised at trial or in a post-trial motion, and that therefore we may deem it waived. (*People v. Amerman* (1971), 50 Ill. 2d 196, 197, 279 N.E.2d 353, 354; *People v. Casper* (1974), 22 Ill. App. 3d 188, 190, 317 N.E.2d 352, 354.) Even when considered on the merits, the police conduct involved did not render defendant's statement involuntary.

In *People v. Smith* (1969), 108 Ill. App. 2d 172, 179-80, 246 N.E.2d 689, 692-93, police allowed the defendant to believe that the only charge under investigation was child abuse, without informing him that the child in question had died. The court held that the police did not have a duty to disclose to an accused all material facts known to them prior to interrogation. Consequently, the defendant's waiver of his *Miranda* rights was not invalidated by the fact that the police withheld this information. The supreme court has reached a similar result. (*People v. Prude* (1977), 66 Ill. 2d 470, 475-76, 363 N.E.2d 371, 373.) In light of these holdings, defendant's contentions do not show that the alleged deception by police rendered his statement involuntary or untrustworthy. Further, police testified that they did not intentionally try to deceive the defendant as to whether the victim was dead or alive. Thus, nothing rendered the circumstances of defendant's statement offensive to basic notions of fairness. Defendant has accordingly established no ground for reversal of his conviction.

The defendant challenges the constitutionality of the natural life statutory provision under which he was sentenced. He asks that we consider his contentions as a matter of plain error, conceding that they are raised for the first time on appeal. The State, citing *Amerman*, asserts that defendant waived the issue by failing to preserve it at trial.

■■ In general, the question of constitutionality of a statute is properly preserved for review only when it has been raised in and passed upon by the trial court. (*People v. Luckey* (1969), 42 Ill. 2d 115, 117, 245 N.E.2d 769, 770.) However, the invalidity of a section of a statute or ordinance may not be invoked by one who is not affected by such invalidity.

(*Village of Itasca v. Luehring* (1954), 4 Ill. 2d 426, 429, 123 N.E.2d 312, 314.) Courts of review will not discuss the constitutionality of a provision of an act which does not affect the parties to the cause under consideration or where the party urging invalidity of such provision is not in any way aggrieved by its operation. *Edelen v. Hogsett* (1969), 44 Ill. 2d 215, 219, 254 N.E.2d 435, 438.

■■ In the instant case defendant was not affected by the "brutal or heinous behavior indicative of wanton cruelty" clause of section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1) until he was sentenced under the provision to a term of natural life imprisonment. Accordingly, we do not deem the matter waived because it was not raised in the trial court, and will address the merits of defendant's arguments.

Defendant's attack on the constitutionality of the natural life sentencing provision is three-pronged. He first argues that the provision is unconstitutionally vague. The provision provides as follows:

"A sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for murder, a term shall be not less than 20 years and not more than 40 years, or, if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty * * * the court may sentence the defendant to a term of natural life imprisonment." Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).

The important considerations in determining whether a statute is void for being vague and indefinite include (1), whether the provision gives reasonable guidance to the average person; and (2) whether it is designed to avoid arbitrary and discriminatory enforcement. (*People v. Nobles* (1980), 83 Ill. App. 3d 711, 715, 404 N.E.2d 330, 335.) Impossible standards of specificity are not required, and courts will assume, absent contrary legislative intent, that the words of the statute have their ordinary and properly understood meanings. (*People v. Schwartz* (1976), 64 Ill. 2d 275, 280, 356 N.E.2d 8, 10.) In addition to the language used, consideration is given to the legislative objective and the evil the statutory provision seeks to remedy. A statute is presumed to be constitutional. *Schwartz*, 64 Ill. 2d 275, 280, 356 N.E.2d 8, 10; *People v. Parkins* (1979), 77 Ill. 2d 253, 257, 396 N.E.2d 22, 24.

There is no case in Illinois which authoritatively defines "exceptionally brutal or heinous behavior indicative of wanton cruelty" under the Unified Code of Corrections. (*People v. Jones* (1979), 73 Ill. App. 3d 99, 104, 391 N.E.2d 767, 769.) However, while commission of the offense of murder is terrible, it is apparent that the legislature did not intend that

every person found guilty should serve a term of natural life. *People v. LaPointe* (1980), 85 Ill. App. 3d 215, 224, 407 N.E.2d 196, 202.)

Illinois courts which have considered the vagueness question as it applies to statutes on sentencing have recognized a distinction between the "arbitrariness" which makes a statute unconstitutional and the legislatively-guided "discretion" which is a function of imposing sentence, to diverse offenders under diverse circumstances. (*People v. Wilbur* (1977), 50 Ill. App. 3d 65, 67-68, 365 N.E.2d 198, 200.) The Fourth District Appellate Court has recently concluded that the natural life provision meets constitutional requirements:

> "The totality of the words used together requiring either the 'brutal' or the 'heinous' behavior to indicate 'wanton cruelty' gives reasonable guidance to the average person and is of a design which would tend to avoid arbitrary enforcement." *People v. Nobles* (1980), 83 Ill. App. 3d 711, 716, 404 N.E.2d 330, 335.

The United States Supreme Court has addressed a similar claim of vagueness recently. In *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, the Supreme Court considered a Georgia death penalty statute which authorized imposition of the death penalty if the murder involved was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." The court concluded that the statute was not unconstitutionally vague on its face.

The court subsequently concluded that the statute could be unconstitutionally applied, however. In *Godfrey v. Georgia* (1980), 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759, the evidence showed that defendant shot and instantly killed his wife and mother-in-law with a shotgun, after his wife rebuffed his efforts at reconciliation. The defendant then called the sheriff's office, and when officers arrived, he acknowledged his responsibility and said, "I've done a hideous crime." Following defendant's conviction for both murders, a jury imposed sentences of death, specifying that the aggravating circumstance as to each conviction was that the offense "was outrageously or wantonly vile, horrible and inhuman."

The Georgia Supreme Court affirmed the sentence, but the United States Supreme Court reversed, holding that the Georgia Supreme Court adopted such a broad and vague construction of the statute as to violate the eighth and fourteenth amendments. The court noted that, in earlier decisions, the Georgia Supreme Court concluded that (1) the evidence that the offense was "outrageously or wantonly vile, horrible or inhuman" must demonstrate "torture, depravity of mind, or an aggravated battery to the victim"; (2) the phrase "depravity of mind" comprehended only the kind of mental state that led the murderer to torture or to commit an

aggravated battery before killing his victim; and (3) the word "torture" must be construed *in pari materia* with "aggravated battery" so as to require evidence of serious physical abuse of the victim before death. The court found that the statute had not been so limited as it applied to *Godfrey*, since defendant did not torture or commit an aggravated battery upon his victims, or cause either of them to suffer physical injury preceding their deaths. Further, the murders did not reflect a consciousness on the part of defendant more "depraved" than that of any person guilty of murder.

The court concluded that the statute must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death." It must provide a "meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not."

■■ While the death penalty is not before us, these supreme court cases help to guide our consideration of the natural life provision. We agree with the Fourth District that the provision is not unconstitutionally vague. Divided into its elements, the provision holds that a court may impose a natural life sentence for murder only if the murder was (1) accompanied by behavior which was (2) brutal or heinous and which (3) indicated wanton cruelty on the part of the perpetrator. The requirement that each of these elements be present provides reasonable guidance as to which acts of murder may justify the imposition of a natural life sentence.

The first element is that the murder be accompanied by behavior other than the mere act of taking another's life, which constitutes the offense of murder. In *Godfrey v. Georgia* the Supreme Court found unconstitutional the imposition of the death penalty where the only conduct or behavior was an instantaneous killing. In applying the natural life provision in Illinois, results have been similar. Thus, where defendant, while in jail, choked his cellmate and banged his head against a wall, thereby killing him, a natural life sentence was upheld. (*Nobles*, 83 Ill. App. 3d 711.) However, where defendant shot the victim, a cab driver, twice in the back of the neck, thereby killing him, the natural life sentence was reduced. *LaPointe*, 85 Ill. App. 3d 215, 224.

The requirement of "accompanying behavior" under the statute is modified by the requirement that the behavior be "brutal" or "heinous," and by the further requirement that such behavior be "indicative of wanton cruelty." These terms are not particularly uncommon or obscure. They are to be given their ordinary and properly understood meanings. Furthermore, whether conduct is "brutal" or "heinous" can often be determined by the objectively observable results of that conduct, such as the physical condition of the victim. Moreover, these terms do not modify or

describe the murder itself, but the behavior accompanying the murder. In that way, the terms of the statute provide a "meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not." Thus the provision is not unconstitutionally vague, but gives reasonable guidance and is designed to avoid arbitrary and discriminatory enforcement.

The defendant also contends that the natural life provision violates article I, section 11 of the 1970 Illinois Constitution, in that it did not require the court to find that defendant could not be restored to useful citizenship. Article I, section 11 provides as follows:

> "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

Defendant argues that the natural life provision of section 5—8—1(a)(1) violates this section of article I, since the statute "requires that the judge focus solely on the nature of the offense in choosing to impose a natural life term." He relies on *LaPointe*, which reduced a natural life sentence, and which stated *in dicta* that "since a natural life sentence utterly rejects the possibility of rehabilitation, such a conclusion should have been supported by facts and findings."

We first reject the notion that the natural life provision of section 5—8—1(a)(1) requires that the judge focus solely on the nature of the offense, without considering the defendant's rehabilitative potential. The statute provides that the judge "may" impose a natural life sentence where the requisite findings are made; "brutal or heinous behavior" is only a threshold requirement for imposition of natural life. Natural life is not mandated whenever those factors are present, regardless of other circumstances. In fact, subsection (b) of section 5—8—1 explicitly authorizes consideration of mitigating factors imposing a sentence under the statute. Many of these mitigating factors reflect on the rehabilitative potential of the defendant.

Furthermore, the eighth amendment requires that consideration be given to the character and record of the individual offender and to the circumstances of the particular offense. This requirement is codified by section 5—5—3.1(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.1(b)). In this way, the balance between seriousness of the offense and the objective of rehabilitation mandated by article I, section 11 of the 1970 Illinois Constitution is effectuated.

Once a natural life sentence is imposed, it does not offer restoration to useful citizenship at all. However, article I, section 11 does not require each and every sentencing alternative to offer restoration to useful citizenship as much as every other alternative, where the sentencing scheme as a whole attempts to strike a balance between this goal and the re-

quirement that penalties be determined according to the seriousness of the crime. Further, the fact that the sentence ultimately imposed precludes restoration to useful citizenship does not mean that rehabilitative potential was disregarded in weighing the factors considered in the sentencing decision. Even *LaPointe* recognizes that sentences of death or natural life may be appropriate and within the guidelines set by article I, section 11. (85 Ill. App. 3d 215, 224, 407 N.E.2d 196, 204.) Therefore, when the natural life provision of section 5—8—1 is read in conjunction with other statutory provisions and the sentencing scheme established by the legislature, it does not violate the provisions of the Illinois Constitution.

Defendant also contends that the natural life provision violates standards of due process and equal protection. This contention is again grounded on his belief that rehabilitative potential is totally ignored when a natural life sentence is imposed. He states:

"By the nature of the act alone, and without regard to the character of the offender, the judge is mandated by the legislature to foreclose the offender's prospect of restoration to useful citizenship. * * * Such unique treatment of a portion of the class of Illinois offenders, in utter disregard of each member's right to consideration of the purpose of restoring each such offender to useful citizenship, is unconstitutional and cannot stand."

As noted previously, we disagree with defendant's basic assertion that a natural life sentence is imposed on the basis of the nature of the offense alone, without considering the rehabilitative potential of the defendant. We also disagree that the judge is *mandated* by the legislature to impose a natural life sentence. The statute provides that such sentence *may* be imposed.

We are careful to note, however, that while the legislature did not mandate a natural life sentence, neither did it leave the sentencing court with unbridled discretion. In imposing sentence on any felony, factors in aggravation and mitigation are to be considered, as well as "any other such factors as the judge shall set forth on the record that are consistent with the purposes and principles of sentencing set out in this Code." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(b).) To construe the word "may" as carte blanche for imposition of a natural life sentence without consideration of all statutory sentencing factors, would violate the concept of limited discretion embodied in the Sentencing Act. However, since the sentencing court's discretion in imposing a natural life sentence for a brutal or heinous murder is modified by these statutory factors, the provision violates neither due process nor equal protection.

Furthermore, once a defendant is sentenced to natural life, he is not denied due process or equal protection as compared to other inmates.

Defendant points out that to treat dissimilarly a group equally situated with another, without sufficient reason, violates the principles of due process and equal protection. We believe there was sufficient reason here, however, and construe the natural life sentence authorized by the legislature as a valid exercise of legislative power to impose harsher penalties upon the most serious offenders.

■■ Legislative classifications, in exercise of the police power, enjoy a presumption of validity which it is the defendant's burden to overcome. The classification must be upheld if facts may reasonably be conceived which justify it, and thus judicial scrutiny is limited to determining whether legislative power has in a given case been exercised arbitrarily. (*People v. McCabe* (1971), 49 Ill. 2d 338, 341, 275 N.E.2d 407, 409.) Murder is not included in any of the classes of felonies set out in the Criminal Code, which indicates a legislative intent to set murder apart from all other offenses. It is not unreasonable for the legislature to have reserved the most severe penalties for the most serious offenses, since doing so promotes the legitimate purposes of protecting the public, deterrence, and maintaining respect for law by not depreciating the seriousness of the worst offenses. Imposition of a natural life sentence, therefore, does not arbitrarily burden some inmates with a disadvantage in contravention of standards of due process and equal protection. Rather, it imposes upon the most serious offenders the consequences of a classification rationally based upon legitimate ends. Accordingly, we do not find the natural life provision of section 5—8—1 to be unconstitutional.

■■ Defendant's final contention is that the trial court's imposition of natural life imprisonment was manifestly erroneous, because the offense was not accompanied by exceptionally brutal behavior indicative of wanton cruelty. We believe the sentence was within the court's discretion, given the facts of the case and the history and character of the defendant.

The record reveals a murder (1) accompanied by behavior, which was (2) brutal or heinous, and which was (3) indicative of wanton cruelty. The victim's death resulted from the cumulative effects of a beating. The testimony contradicts any claim of a fight between equals, or that the victim retaliated in any way. Defendant outweighed the victim by almost 100 pounds. Defendant struck the victim in the head with a tire iron. The victim tried to escape, but defendant pursued him and knocked him to the ground. As he lay on the ground, defendant stood over him, striking him with his fist and kicking him in the ribs. While the beating went on, the victim appeared in a "state of semi-consciousness, bloody." Abrasions later found on the victim's arms revealed that his posture was defensive, not aggressive, and were the result of his futile attempts to ward off the defendant's blows. Discoloration and subcutaneous bleeding, which took

place before death, were the result of the beating which defendant administered. The victim's body was found face down in the lake, and evidence tended to show that defendant robbed the body and then shoved it into the water.

The defendant's behavior exceeded the conduct necessary to establish the elements of murder. His actions bore no resemblance to the instantaneous shooting murder perpetrated by the defendant in *LaPointe*. That defendant's behavior accompanying the murder was brutal or heinous and indicative of wanton cruelty was objectively borne out by the condition of the victim's body when it was found. Furthermore, the evidence indicates that many of the blows inflicted in the beating were administered by the defendant with the intent to administer severe physical pain and suffering, rather than to specifically kill the victim. The motive was apparently not robbery, or even murder, but rather to administer physical punishment for a real or imagined wrong. It is precisely this type of behavior which is addressed by the natural life clause of the statute. It is also this type of behavior which reflects defendant's "wanton cruelty," above and beyond that present in any murder.

We also find nothing in defendant's history and character which would indicate that the trial court erred in denying the defendant an opportunity to return to useful citizenship by imposing natural life imprisonment. His prior record, which the court noted in imposing sentence, included convictions for robbery, theft, assault, burglary, and forgery. Evidence tended to indicate that his beating and murder of the victim herein was motivated to some degree by circumstances surrounding a prior conviction. We find nothing which would indicate that defendant's rehabilitative potential was disregarded, or was sufficient to make a natural life sentence an abuse of discretion.

As an ancillary contention, defendant asserts that the trial court erred in finding in aggravation that defendant "received compensation for committing the offense." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(a)(2).) "Compensation" has been interpreted to include money obtained from the victim of an offense. (*People v. Conover* (1980), 83 Ill. App. 3d 87, 403 N.E.2d 708, 709.) This court has disagreed. (*People v. Starnes* (1980), 88 Ill. App. 3d 1141, 411 N.E.2d 125.) In any event, there is no indication that the natural life sentence imposed was based on a finding of compensation or that it would have been different had the matter not been considered, and we hold any error harmless.

For the foregoing reasons, we affirm the natural life sentence imposed by the trial court.

Affirmed.

JONES, P. J., and KARNS, J., concur.